J-A04019-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| WILFREDO RAMOS | |
| Appellant | No. 426 EDA 2015 |

Appeal from the PCRA Order dated January 16, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0100891-1999

BEFORE: SHOGAN, J., SOLANO, J., and PLATT, J.[*]

MEMORANDUM BY SOLANO, J.: **FILED SEPTEMBER 27, 2017**

Appellant Wilfredo Ramos was convicted in 1999 of the murder of James Crawford, otherwise known by the nickname "Jazzie," who was killed in the course of a drug transaction. Appellant appeals from an order by the Court of Common Pleas of Philadelphia County that denied his petition under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546, for relief from his judgment of sentence. We affirm.

The facts of this action were described by the Supreme Court in **Commonwealth v. Ramos**, 827 A.2d 1195 (Pa. 2003), **cert. denied**, 541 U.S. 940 (2004), and we draw on that description for an overview of the events that are the subject of this appeal:

---

[*] Retired Senior Judge assigned to the Superior Court.

The record below establishes that on October 11, 1998 at approximately 2:30 in the morning, James Crawford was standing in front of a bar at the corner of Lawrence and Indiana Streets in Philadelphia. Jeanine Davis, the girlfriend of Crawford's cousin, approached Crawford with the intent of procuring drugs from him. Crawford and Davis walked into a nearby abandoned house at the corner of Leithgow and Indiana Streets for the purpose of using drugs. When the two entered the house, Nick Cruz was inside. Meanwhile, Appellant and his half-uncle, Michael Centeno, drove up in a car and parked in the middle of Leithgow Street. Appellant and Centeno exited the car and walked toward the corner of Lawrence and Indiana Streets, where Crawford's friend Robert Kennedy was standing. As Appellant approached Kennedy, he asked Kennedy if anybody had any drugs. In response, Kennedy yelled for Crawford. Crawford told Davis and Cruz that he would be right back, and he left the house.

A few minutes later, Davis, who was standing inside the house, saw Appellant and Crawford together directly in front of the house.[5] As Appellant began to walk away from Crawford, Davis heard Crawford yell, "Yo, man, give me my s--t." N.T., 12/27/1999, at 70. In response, she heard Appellant command Crawford to "[b]ack up." *Id.* Davis then saw Appellant turn around and shoot Crawford in the chest from about three feet away.

[5] As the house was dark and its doors and windows were missing, Davis stood just inside the doorway so that she could see and hear what was going on outside without being seen from the outside herself. Similarly, Cruz stood just inside of a window opening to watch and hear these events unfold.

Once Crawford fell to the ground, Davis watched Appellant turn around in a circle and look around, which gave her a clear view of Appellant's face. She recognized Appellant from having previously seen him in the neighborhood. Davis then observed Appellant walk across the street and climb into the passenger seat of the car parked on Leithgow Street. The car sped away.

Davis subsequently gave a statement to police in which she described the shooter as a six-foot-tall Hispanic male with a thin build, about twenty to twenty-five years old, which is consistent with Appellant's physical description. Using these characteristics, [Homicide Unit Detective Paul McElvie] generated

a line-up containing 106 different photographs [using an imaging machine. N.T., 12/28/99, at 10-11]. Out of this line-up, Davis selected two different photographs of Appellant[1] and stated that he was the shooter.[6]

> [6] Cruz and Kennedy also gave statements[2] to police in which they gave physical descriptions of the shooter. Those statements were consistent not only with each other but also consistent with Appellant's physical description. Cruz and Kennedy also gave physical descriptions of the shooter's accomplice that were consistent with each other and with Centeno's physical description. Cruz . . . apparently did not participate in a photographic line-up, however, nor did [Cruz and Kennedy] testify at trial. . . .

*Id.* at 1196–97.

Cruz gave two statements to police. In the first, conducted on October 11, 1998, Cruz stated that Kennedy was standing on the corner of Lawrence and Indiana Streets when the shooting occurred. Investigation Interview Record of Cruz, 10/11/98, at 2. Kennedy's location at the time of the shooting was also confirmed by Davis, who stated that, upon her arrival at the scene, Kennedy was standing on the corner of Lawrence and Indiana Streets, in front of the bar. Investigation Interview Record of Davis, 10/11/98, at 1-2.

---

[1] Detective McElvie testified that he had been unaware that there was a second, different photograph of Appellant in the array until Davis indicated it. N.T., 12/28/99, at 12.

[2] Kennedy gave two separate statements to police. Kennedy gave his first statement on October 14, 1998; that statement was marked as Petitioner's Exhibit 3 ("P-3") during Appellant's PCRA hearing on July 14, 2008. Kennedy gave his second statement on November 12, 1998; that statement was marked as Petitioner's Exhibit 4 ("P-4") during Appellant's PCRA hearing on July 14, 2008.

In Kennedy's first police statement on October 14, 1998, he likewise stated that he "was standing on the S/W corner" of Lawrence and Indiana Streets, "beside the Family Place Bar." Then he "turned towards the bar. . . . Then [he] heard a gunshot. [He] turned around and saw the guy with the striped shirt with the gun in the air[.]" Investigation Interview Record of Kennedy, 10/14/98, at 1-2. Kennedy also stated that the killer was wearing sunglasses. *Id.* at 3. When asked who else witnessed the shooting, Kennedy answered, "I guess the two people that was in the house, Jeanine [Davis] and the guy with the bad leg." *Id.* at 4.[3]

On November 12, 1998, Kennedy viewed a photographic array and gave a second statement to police, in which the following exchange occurred:

> Q. Mr. Kennedy you have also told [the detective conducting the interview] that the male in the # 2 position [in the photographic array] is the man that shot James Crawford on 10-11-98 is that correct?
>
> A. Yes. I have seen him in the area a number of times. (identifying PP # 768938 assigned to Wilfredo Ramos.)

Investigation Interview Record of Kennedy, 11/12/98, at 2.

> On November 17, 1998, Appellant was arrested and interviewed by police. Appellant gave a statement to police,[4] admitting

---

[3] Kennedy did not further identify "the guy with the bad leg."

[4] Appellant's statement included his admission that he "was dealing drugs at 4th and Somerset Street" on the night of the murder. N.T., 12/28/99, at 48; Ex. P-12A, 9/25/08, at 4. The detective who took Appellant's statement, Detective Reinhold, testified that Appellant answered his questions
*(Footnote Continued Next Page)*

- 4 -

that he had been present at the shooting but accusing Centeno of robbing and shooting Crawford. According to Appellant's statement, as he was on his way to buy drugs at Lawrence and Indiana Streets, he ran into Centeno. When Centeno found out where Appellant was going, he decided to join him, telling Appellant that he was looking to "stick somebody up" and promising to split the proceeds of the robbery with Appellant. N.T., 12/28/1999, at 48 (testimony of Philadelphia Police Detective Richard Reinhold, in which he read Appellant's statement into evidence). Appellant claimed that on the way, Centeno showed him the gun he planned to use to commit the robbery, but Appellant contended that he did not know that Centeno was going to shoot anyone. Appellant also claimed that upon arriving at Lawrence and Indiana Streets, he bought a bag of heroin and four rocks of crack cocaine from Crawford and then walked away. Soon thereafter, according to Appellant, he heard a shot and saw Centeno running down Leithgow Street with a gun in his hand.

*Ramos*, 827 A.2d at 1197–98. On February 1, 1999, Centeno was arrested and charged with murder. N.T., 12/28/99, at 58.

At Appellant's preliminary hearing on December 24, 1998, Davis gave testimony that aligned with her police statement. N.T., 12/24/98, at 5-9, 13, 17-18, 28-29.

*Voir dire* occurred from December 20 to 23, 1999.[5] Prior to the start of Appellant's trial, his counsel asked the trial court to order Kennedy and Cruz to be held in Philadelphia County custody so that they could be brought to the courthouse each day of trial and be reached immediately to testify, if

_(Footnote Continued)_ ────────────

coherently and appeared to be of sound mind and not under the influence of alcohol or drugs. N.T., 12/28/99, at 40.

[5] As discussed later in the text, two days of the four days of *voir dire* proceedings were never transcribed and were never provided to Appellant or his appellate counsel.

- 5 -

necessary. N.T., 12/27/99, at 64-66. The trial court agreed. The guilt phase of Appellant's jury trial was held on December 27 to 30, 1999; the penalty phase followed from January 10 to 11, 2000.

> At Appellant's trial, Davis testified to what she saw in the early morning hours of October 11, 1998, and identified Appellant as the shooter. The Commonwealth also introduced Appellant's police statement into evidence to show that Appellant had admitted to being present during the shooting. Furthermore, Dr. Gregory McDonald, a forensic pathologist, testified that Crawford died of a gunshot that was fired into his chest from point-blank range. Officer James Joyce, an expert in firearms identification, testified that the fatal bullet had been fired from a nine-millimeter or a thirty-eight-caliber handgun, which was consistent with the nine-millimeter cartridge case found by police at the scene of the shooting.

*Ramos*, 827 A.2d at 1198.

Detective Reinhold also testified at Appellant's trial. During his cross-examination, the following exchanges occurred:

> Q.   Is it fair to say that the information which was furnished by [Appellant] was one of the basic matters which ultimately resulted in your arresting Michael Centeno and charging him with the murder of James Crawford?
>
> A.   That and the statement that Michael Centeno made that [Appellant] was the shooter.
>
> *   *   *
>
> Q.   Now just so we get our time sequences correct, Detective Reinhold, before you interviewed [Appellant] on November the 17th of 1998 you had already taken statements from other people in this case, Nicholas Cruz, Robert Kennedy; isn't that so?
>
> A.   That's correct, sir.
>
> *   *   *

- 6 -

Q.    Do you have any specific information from any source, very limited question, any source, as to what corner Michael Centeno was standing on while [Appellant] bought drugs from James Crawford?

A.    From other witness interviews the corner would have been the southeast corner [of Lawrence and Indiana Streets].

\*    \*    \*

[Q.  A]s the assigned detective and having interviewed Mr. Cruz and Mr. Robert Kennedy they also furnished information to you that the shooter was wearing sunglasses; isn't that right?

A.    And that Wilfredo Ramos was the shooter.

\*    \*    \*

[Q.] You already told us that you took statements from Robert Kennedy also known as Midnight and from Mr. Nick Cruz.  My question was isn't it a fact that in the statements you took from those two people whose names I've mentioned, those two people, Mr. Kennedy and Mr. Cruz both told you when you interviewed them at some point that the shooter of James Crawford was wearing sunglasses, yes or no?

A.    I believe that is true, sir.  I don't have those interviews in front of me.  I believe that's true.

N.T., 12/28/99, at 58, 65-69.

Prior to Detective Reinhold's re-direct examination, the Commonwealth asked to have Kennedy's first statement and Cruz's statement marked as Exhibits C-8 and C-9, respectively.  N.T., 12/28/99, at 71-72, 74.  Trial defense counsel then asked for an offer of proof as to what information the Commonwealth intended to solicit from Detective Reinhold with these statements.  The Commonwealth explained that after defense counsel had asked the detective whether he took descriptions of the killer from Kennedy

- 7 -

and Cruz, "[w]hat [the Commonwealth] propose[d] to do [was] ask Detective Reinhold to complete the description which was given." *Id.* at 72-73. Defense counsel stated that he had "no problem with that." *Id.* at 73.

On re-direct, Detective Reinhold testified as follows:

Q.    Detective Reinhold, [defense] counsel asked you some questions about statements that you took from other individuals, specifically a Robert Kennedy and a Nick Cruz, I believe. Referring first to a document that has been marked for identification as C-8 . . . , could you tell us what that is?

A.    This is the interview . . . that I took from Robert Kennedy on October 14th, 1998 at 8:25 p.m. in reference to the murder of James Crawford.

Q.    Counsel asked you about descriptive information that was given to you by that witness. Could you please – and I believe I can refer you to page 3 of that document, correct me if I'm wrong. . . . Does the witness in fact give you descriptions of two men that he saw at Leithgow and Indiana on October 11th, 1998?

A.    Yes, he does.

Q.    Could you tell us what those description[s] are?

A.    "Describe the man who asked you if you had weed."

"Hispanic male, 18 to 19 years, short, medium-complected, clean-shaven, black, short hair wearing a black flight jacket. I think he had overalls underneath the jacket. He had the jacket pulled up on his chin but I could still see his face. I'll never forget his face. He was shorter than me, maybe 5'5"."

"Describe the man who shot Jazzie."

"He was tall, about six feet to 6'1, Hispanic male, 27 to 28, thin build, wearing red striped hoodie, like a regular pullover shirt with a hood on it and sunglasses." . . .

Q.    Could you tell us what descriptions Mr. Cruz gave you.

A.   "Question:  Describe the shooter.

"Answer:   He was a light-skinned black male or Hispanic male, 20 to 25 years old, 6'1, thin build, clean-shaven, wearing a grayish or bluish coat with a hood attached and lines going down the coat.  It looked like different colored stripes.  The main color was all blue.  He was wearing gold-rimmed glasses with dark lenses.

"Question:  Describe the Number 2 black male.

"Answer:   He was a black male, his face was covered by the blue zippered jacket, 5'8, 165 pounds, dark-complected, low cut black hair."

N.T., 12/28/99, at 73-76.

Later, during the closing jury charge, the trial court gave the following

instructions:

The defendant is not on trial on charges relating to drug dealing. You must not regard this evidence as showing that the defendant is a person of bad character or criminal tendencies from which you might be inclined to infer guilt.  If you find that the defendant is guilty of the crimes charged in this case it must be because you are convinced by the evidence that he committed the crimes charged in this case and not because you believe that he is wicked or has committed any other offense. . . .

Ladies and Gentlemen, you may find the defendant guilty of a crime without finding that he personally engaged in the conduct required for commission of that crime.  A defendant is guilty of a crime if he is an accomplice of another person who commits that crime. . . . He is an accomplice if with the intent of promoting or facilitating the commission of the crime he aids, agrees to aid or attempts to aid the principal in planning or committing the crime.  You may find the defendant guilty of the crime on the theory that he was an accomplice as long as you are satisfied beyond a reasonable doubt that the crime was committed and that he defendant was an accomplice of the person who committed it. . . .

First degree murder is a murder in which the killer has specific intent to kill. . . . [T]he killer [killed Crawford] with the specific

- 9 -

intent to kill and with malice. . . . All that is necessary is that there be time enough so that the killer can and does fully form an intent to kill and is conscious of that intention. When deciding whether the killer had the specific intent to kill, you should consider all the evidence regarding his words and conduct and the attending circumstances that may show his state of mind.

N.T., 12/30/99, at 15-17, 25-26.

The Supreme Court described the outcome of Appellant's trial as follows:

[The] jury found Appellant . . . guilty of, *inter alia,* first-degree murder for shooting and killing James Crawford.[1] Following a penalty-phase hearing, the jury found one aggravating circumstance[2] and no mitigating circumstances and accordingly, returned a verdict of death. On January 11, 2000, the trial court formally imposed a sentence of death.[3] Appellant filed timely post-trial motions, which the trial court denied.

[1] The jury also found Appellant guilty of robbery, criminal conspiracy, possessing an instrument of crime, and carrying a firearm without a license. [The jury made no finding as to second- or third-degree murder. Verdict Report, 12/30/99, at 1, R.R. at 5997a.]

[2] The aggravating circumstance the jury found was that Appellant committed the murder during the perpetration of a felony. **See** 42 Pa.C.S. § 9711(d)(6).

[3] Appellant was also sentenced to consecutive terms of ten to twenty years in prison for each of his convictions for robbery and criminal conspiracy but received no additional penalty for his convictions for possessing an instrument of crime and carrying a firearm without a license.

**Ramos**, 827 A.2d at 1196. During the penalty phase, the trial court gave

the following jury instruction:

In this case under the sentencing code only the following, if proved to your satisfaction beyond a reasonable doubt, can be found to be an aggravating circumstance; that is that the

defendant committed a killing while in the perpetration of a felony. In order to find this aggravating circumstance all of you must be convinced beyond a reasonable doubt that the defendant committed the killing and was not merely an accomplice or co-conspirator of the person who actually committed the killing. You may find this to be an aggravating circumstance in this case only if you are unanimously convinced beyond reasonable doubt of this aggravating circumstance.

N.T., 1/11/00, at 65-66 (emphasis added). The jury's verdict at the penalty phase thus was rendered in light of this instruction, and the jury thus found that Appellant actually was a principal in the killing of Crawford, and not merely an accomplice to the crime. **Ramos**, 827 A.2d at 1196 ("The aggravating circumstance the jury found was that Appellant committed the murder during the perpetration of a felony").

Under the Judicial Code, 42 Pa.C.S. § 9711(h), the Supreme Court of Pennsylvania must review the sufficiency of the evidence in all cases in which a defendant is sentenced to death. After conducting that review, the Pennsylvania Supreme Court held: "Given this record, we agree with the trial court that the evidence was clearly sufficient to sustain Appellant's conviction for first-degree murder." **Ramos**, 827 A.2d at 1198. The Court also observed:

In his second and third claims [made in his direct appeal to the Supreme Court], Appellant essentially argues that trial counsel was ineffective for failing to object to the trial court's jury instruction on accomplice liability and for failing to file a motion *in limine* in order to redact references to drugs i[n A]ppellant's statement to the police. . . . [T]he proper procedure is for this court to dismiss Appellant's ineffectiveness claims without prejudice to Appellant to raise those claims in a petition filed pursuant to the Post-Conviction Relief Act[.]

*Id.* at 1198-99. The Supreme Court affirmed the verdict, and the United States Supreme Court denied certiorari.

On July 7, 2004, Appellant timely filed the current PCRA petition.[6] On July 27, 2005, Appellant filed a motion for discovery, requesting the photographic array that had been shown to Davis and "all Philadelphia Police Department files, including homicide files, pertaining to the investigation and prosecution of [Appellant] and co-defendant Michael Cent[e]no for the murder of James Crawford." Pet'r's Mot. for Discovery, 7/27/05, at 1. Appellant argued that "the police files likely contain information that pertains not only to [Appellant]'s innocence or guilt in the death of Mr. Crawford, but also to mitigating factors warranting the imposition of a non-death penalty sentence." *Id.* at 7 ¶ 14. Appellant added that he should "be given a full opportunity to conduct a meaningful investigation into all evidence in this case, including any leads, alternative theories, or additional witnesses considered by police. The police files would likely contain any such information and would therefore be invaluable[.]" *Id.* at ¶ 16. On November 7, 2005, the PCRA court held a hearing on this first discovery motion and denied it, concluding that it was a "fishing expedition[.]" N.T., 11/7/05, at 29.

---

[6] The PCRA petition was heard by the same judge who presided over Appellant's jury trial.

On August 31, 2007, Appellant filed a second motion for discovery, pursuant to **Brady v. Maryland**, 373 U.S. 83 (1963), seeking (1) information about the Commonwealth's compensation of or agreement with Davis, (2) Philadelphia Police Department log entries relating to an individual named "Will," (3) the Commonwealth's file for co-defendant Centeno, and (4) any Commonwealth files relating to any investigation of a suspect named "Santos Roland," who was identified as a possible suspect in an Investigation Interview Record. In support of his request for the police department logs, Appellant wrote:

> [Appellant] believes that Ms. Davis misidentified [Appellant], confusing him with "Will," another individual who frequented the drug corners in the area who is the actual shooter.

> Ms. Davis's testimony gives good cause to believe that Philadelphia Police Department Incident Logs for the 25th Police District contain entries during the relevant time period relating to an individual known as "Will." [Appellant]'s pleading gives good cause to believe that such entries refer to someone other than him. Collectively, they establish good cause to believe that Philadelphia Police Department Incident Logs for the 25th Police District contain entries during the relevant time period relating to police knowledge of the existence and activities of an individual other than [Appellant], known as "Will," who may be the shooter in this case.

Pet'r's Mot. for Discovery Pursuant to **Brady v. Maryland**, 8/31/07, at 10 ¶¶ 45-46. With respect to his renewed request for the Commonwealth's file on Centeno, Appellant asserted: "The Commonwealth's file for Mr. Centeno likely contains potentially exculpatory information demonstrating [Appellant]'s innocence." **Id.** at 12 ¶ 55.

On October 18, 2007, the PCRA court held a hearing on Appellant's second discovery motion. Regarding Appellant's request for any information about any compensation of Davis by the Commonwealth for her testimony, Appellant claimed, "We don't know what she got, it was something." N.T., 10/18/07, at 5. Appellant continued: "So to date, we've never gotten any confirmation from the [District Attorney]'s office that this occurred, but we believe that it did occur." *Id.* The Commonwealth replied that "nothing was given to her." *Id.* at 9.

During this hearing, Appellant also maintained that Davis had chosen someone named "Will" while viewing the photographic array; Appellant complained that no discovery was given to him "about who this person Will was." N.T., 10/18/07, at 11. Appellant thus requested the log entries from the Philadelphia Police Department's 23rd District station in order to determine whether there was anyone by the name of "Will" who was arrested or investigated in relation to this case. The PCRA court suggested that Davis "identified [Appellant] whose name was Wilfredo, and she referred to him as Will." *Id.* The Commonwealth replied that, except for Appellant, there was no one else named "Will" connected to the investigation: "There's just Wil-fre-do. There is no other Will." *Id.* at 12. The Commonwealth again insisted that Appellant's discovery request was "a classic fishing expedition." *Id.* at 16. The Commonwealth also stated that it had "nothing exculpatory, or [it] would have turned it over already." *Id.* at

18. At the close of the hearing, the PCRA court denied Appellant's second discovery motion. *Id.* at 21.

On April 17, 2008, the PCRA court vacated Appellant's death sentence "based upon the Commonwealth's agreement not to contest [Appellant]'s request for a new penalty hearing based upon ineffective assistance of trial counsel at the penalty hearing for failure to investigate and present certain mitigation evidence." Order, 04/17/08. The court took no additional action on Appellant's other grounds for PCRA relief at that time. Appellant is now serving a life sentence without the possibility of parole.

Between 2008 and 2012, the PCRA court held nine days of PCRA hearings. At a hearing on July 14, 2008, Kennedy testified that Davis was high on drugs at the time of the killing. N.T., 7/14/08, at 56-59, 138; N.T., 7/15/08, at 15. Kennedy also testified he had told police that he had not seen the shooting, because he was inside the bar when he heard shots, and that Crawford was already shot when he "came outside" the bar. N.T., 7/14/08, at 45, 68-69, 76. Kennedy continued that, when he returned to the bar, he was told that a detective was "looking for" him, and he then "walked up to them," after which "they asked [him] a bunch of questions." *Id.* at 69. When shown his first police statement, in which he described a man holding a gun immediately following the shooting, Kennedy testified that "the officer . . . typed that" and that "[h]e never asked me questions like while we were at the desk and he was typing. . . . he didn't ask [Kennedy] line by line while he typed it." *Id.* at 75-76. Kennedy added that

he had not read this first statement before signing it; he did not recognize his second statement; and he did not identify Appellant as the shooter at any time. *Id.* at 84-86.

Kennedy further testified that he had felt compelled to sign the two statements after the police had referenced his open bench warrants. N.T., 7/14/08, at 71-74 ("I kept looking at the door . . . waiting for a sheriff to come in and arrest me for my bench warrants"). Kennedy added that he had viewed a photographic array with eight photographs and that the police had asked him, "Have you ever seen him before?" Kennedy testified that he had identified Photograph # 5 on the array in response to that question; however, Appellant's photograph was # 2 on the array. *Id.* at 80-81, 84.

On July 15, 2008, Appellant's direct appeal counsel testified and was asked why he limited the number of issues he raised in the case:

[Q. W]hy did you not raise any issues other than the three that we've discussed above? Did you come up with any and decide not to raise them?

A. No, those are the only ones I could find.

Q. Were there any tactical or strategic reasons –

A. No.

Q. -- for not raising any other meritorious issues other than those three?

A. No, I just raised whatever I could find.

N.T., 7/15/08, at 174-75.

At the beginning of the PCRA hearing on September 25, 2008, Appellant made a discovery request for Centeno's polygraph tests. N.T., 9/25/08, at 4. Appellant argued that the test was discoverable, even if it was not admissible. *Id.* at 4-5. The Commonwealth answered that Appellant "not receiving the polygraph results in no way impedes [his] ability to call Centeno as a witness." *Id.* at 9-10. The PCRA court denied this additional discovery request by Appellant. *Id.* at 11.

Appellant's trial counsel testified on September 25 and 26, 2008, and April 27, 2009. Trial counsel testified that he hired a private detective to investigate the case; the private investigator accompanied trial counsel to the crime scene one time, prepared a sketch and took photographs of the crime scene, and interviewed Appellant. N.T., 9/25/08, at 30, 136-39. When asked if he "expected" to "be responsible for performing the rest of the factual investigation and pretrial preparation" himself, trial counsel answered affirmatively. *Id.* at 139.

Trial counsel confirmed that Davis was the only witness who testified at the preliminary hearing. N.T., 9/25/08, at 35. Trial counsel testified about the photographic array shown to Davis as follows:

Q. When you received the initial discovery package from the Commonwealth, you were invited to go to the district attorney's office to review, specifically, to review photos and physical evidence, correct?

A. Yeah. That was one of the things that [the Commonwealth] said in [its] cover letter to me that if I had any requests for information I could get in touch with the DA's office.

Q.    And you did not do that, correct?

A.    I did not.

Q.    Am I correct that prior to trial you had not seen any of the hundred or so photographs that Miss Davis had been shown on the machine, correct?

A.    I did not.

Q.    And nor did you have any knowledge as to what parameters had been input into the imaging machine which generated that array, correct?

A.    That is true.

Q.    And you would have needed to have that information, would you not, in order to consider whether a motion to suppress this identification was warranted?

A.    That is true.

Q.    You wouldn't have been able to determine whether this photographic array was unduly suggestive without having seen the whole array or the parameters that were put into the machine, correct?

A.    I think that's a fair statement, yes.

*Id.* at 105-06.

Trial counsel gave the following additional testimony:

- He was provided with statements from six police officers involved in the investigation — Officers Serrano, Spicer, Long, Simpson, and Coleman and Sergeant Palumbo — but he did not interview or contact any of them prior to trial. N.T., 9/25/08, at 47.

- He "had no strategic or tactical reason for not objecting to" Detective Reinhold's testimony. N.T., 9/25/08, at 185.

- He "was not of the impression that [Appellant] had any mental problems." N.T., 4/27/09, at 62. He explained that Appellant "always seemed to be able to communicate"; "[Appellant] answered all my questions. When he had questions, I tried to answer his questions and it seemed to me there was pretty good communication between the two of us." N.T., 9/25/08, at 177.

Trial counsel stated that his trial strategy was to argue that Centeno was the killer, not Appellant. N.T., 4/27/09, at 61. He explained that the reason he chose not to move to suppress Appellant's police statement was that the statement was in line with this alternative theory of the case — that is, "that [Appellant's] uncle [Centeno] was the shooter." *Id.*

When the PCRA hearings resumed on May 24, 2010, the PCRA court heard testimony about Appellant's cognitive abilities from defense expert Carol L. Armstrong, Ph.D., a neuropsychologist and University of Pennsylvania professor. N.T., 5/24/10, at 65-68. Dr. Armstrong testified that Appellant has a "significant intellectual disability" and "mild mental retardation." *Id.* at 79, 83. She added that the Appellant's IQ has been tested repeatedly and demonstrated a steady decline, with his most recent full-scale IQ being only 65.[7] *Id.* at 81. The next day, Appellant's mother

---

[7] When Appellant's IQ was first tested in 1989, his IQ was 73. In 1999, his IQ was 71, and, by 2000, it was 70. Most recently, in 2006, his IQ was 65. N.T., 5/24/10, at 81.

testified that Appellant's primary language is English, not Spanish. N.T., 5/25/10, at 277, 290, 351.

After another delay of over a year and a half due to witness and counsel unavailability, the PCRA hearing resumed on January 4 and 5, 2012, with additional testimony about Appellant's mental abilities from Commonwealth witness Dr. John Sebastian O'Brien, who practices general and forensic psychiatry. N.T., 1/14/12, at 16. Dr. O'Brien testified that Appellant suffers from a "cognitive disorder not otherwise specified" and "clearly has deficits in IQ testing." *Id.* at 111; N.T., 1/15/12, at 17.

On January 16, 2015, the PCRA court issued an order denying Appellant's remaining grounds for PCRA relief. Appellant then filed this timely appeal, in which he raises the following eleven issues:

> 1. Whether the PCRA court erred in finding that the jury instructions in [Appellant]'s trial did not contravene **Commonwealth v. Huffman**[, 638 A.2d 961 (Pa. 1994)]?
>
> 2. Whether trial counsel's failure to interview key witnesses, request discovery from the Commonwealth, and examine evidence used at trial constitutes ineffective assistance of counsel?
>
> 3. Whether the Commonwealth's failure to disclose and to correct discrepancies between a witness's statements and an investigation interview record violated [Appellant]'s due process rights?
>
> 4. Whether trial counsel was ineffective for failing to call two

witnesses[8] who were available to provide testimony that contradicted the Commonwealth's sole eyewitness?

5.      Whether trial counsel was ineffective for failing to object to hearsay statements introduced by the Commonwealth in violation of [Appellant]'s rights to confront his accusers under the United States and Pennsylvania Constitutions?

6.      Whether trial counsel was ineffective for failing to seek to suppress [Appellant]'s coerced and involuntary statement to police, or to object to the introduction of the statement at trial?

7.      Whether the introduction of "other crimes" evidence, specifically [Appellant]'s unrelated past involvement in drug dealing, violated his due process rights?

8.      Whether the lack of a complete appellate transcript deprived [Appellant] of his right to meaningful appellate review under Article V, § 9 of the Pennsylvania Constitution?

9.      Whether [Appellant]'s appellate counsel provided ineffective assistance by failing to raise meritorious constitutional claims on direct appeal?

10.    Whether the cumulative errors made by trial counsel, the Commonwealth, and the lower court entitle [Appellant] to a new trial?

11.    Whether the PCRA court erred in denying [Appellant]'s three discovery motions?

Appellant's Brief at 2-4 (reordered to facilitate disposition).

Our standard of review of a PCRA court's denial of a PCRA petition is limited to examining whether the PCRA court's determination is supported by the record evidence and free of legal error. ***Commonwealth v. Wilson***,

_____

[8] Although Appellant's Statement of the Questions mentions "two witnesses," the argument in his brief discusses only one, Kennedy. ***See*** Appellant's Brief at 61-64. We therefore will consider only the failure to call that witness.

824 A.2d 331, 333 (Pa. Super.) (*en banc*), **appeal denied**, 839 A.2d 352 (Pa. 2003). Additionally, "[a] PCRA court passes on witness credibility at PCRA hearings, and its credibility determinations should be provided great deference by reviewing courts." **Commonwealth v. Raymond Johnson**, 966 A.2d 523, 539 (Pa. 2009).

### Jury Charge under *Commonwealth v. Huffman* (Appellant's Issue 1)

Appellant first contends that the jury charge on shared specific intent failed to comply with **Commonwealth v. Huffman**, 638 A.2d 961 (Pa. 1994). He also contends that his trial counsel was ineffective for failing to object to this aspect of the charge and in failing to request an appropriate charge under **Huffman**. Appellant's Brief at 24-25, 31.[9]

In **Huffman**, our Supreme Court addressed an instruction that failed to tell the jury that it could find an accomplice guilty of murder in the first degree only if the accomplice had a specific intent to kill. The Court held that such a charge was a misstatement of the law on a fundamental issue

---

[9] In Appellant's Statement of Questions Involved pursuant to Pa.R.A.P. 2116, his first issue raised before this Court on appeal is: "Whether the PCRA court erred in finding that the jury instructions in [Appellant]'s trial did not contravene **Commonwealth v. Huffman**?" Appellant's Brief at 2 ¶ 1. That question does not raise any issue regarding ineffectiveness of counsel. Rule 2116(a) provides: "No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby." Because we find Appellant's claim under **Huffman** to be without merit, we need not decide whether to hear a claim that counsel was ineffective in failing to make that claim. "[C]ounsel cannot be considered ineffective for failing to pursue a meritless claim." **Commonwealth v. Lopez**, 739 A.2d 485, 495 (Pa. 1999), **cert. denied**, 530 U.S. 1206 (2000).

relating to culpability and, thus, was harmful error depriving the defendant of a fair trial. 638 A.2d at 962. The Court emphasized that the charge must tell the jury that to find an accomplice guilty of first-degree murder, it must find that the **accomplice** harbored a specific intent to kill, and it is not sufficient to find only that such an intent was harbored by the **principal**. *Id.*

> The disputed jury instruction at issue here stated:
>
> A defendant is guilty of a crime if he is an accomplice of another person who commits that crime. . . . He is an accomplice if with the intent of promoting or facilitating the commission of the crime he aids, agrees to aid or attempts to aid the principal in planning or committing the crime. You may find the defendant guilty of the crime on the theory that he was an accomplice as long as you are satisfied beyond a reasonable doubt that the crime was committed and that the defendant was an accomplice of the person who committed it. . . .
>
> First degree murder is a murder in which **the killer** has **specific intent to kill**. . . . [**T**]**he killer** [killed Crawford] with the **specific intent to kill** and with malice. . . . All that is necessary is that there be time enough so that the killer can and does fully form an intent to kill and is conscious of that intention. When deciding whether **the killer** had the **specific intent to kill,** you should consider all the evidence regarding his words and conduct and the attending circumstances that may show his state of mind.

N.T., 12/30/99, at 25-26 (emphases added).

Appellant contends that he was charged with murder either as an accomplice or as a principal, and that, with respect to his potential culpability as an accomplice, the PCRA court erred in finding that the jury charge on shared specific intent did not violate **Huffman**. Appellant argues that the instruction misled the jury into believing that, if **the killer** had the

- 23 -

specific intent to kill, then the killer's intent alone is sufficient for the jury to find first degree murder, **irrespective of what the accomplice's intent was**. Thus, according to Appellant, even if the jury concluded that Centeno shot the victim and that Centeno alone had the specific intent to kill, the instruction misled the jury into believing that it could convict Appellant of first-degree murder, regardless of Appellant's own personal intent. He maintains that the charge "impermissibly relieved the Commonwealth of its burden to prove the specific intent element of first-degree murder, violating [Appellant]'s Fourteenth Amendment due process rights." Appellant's Brief at 28. Appellant contends that the trial court's "improper instruction on shared specific intent for murder was not harmless error[,]" because "the Commonwealth cannot demonstrate beyond a reasonable doubt that this error could not have contributed to the guilty verdict." *Id.* at 30 (citing **Commonwealth v. Story**, 383 A.2d 155, 162 (Pa. 1978)).

Appellant argues further that, as he was not convicted of second- or third-degree murder, the life sentence he is now serving cannot ameliorate any prejudice suffered as to the instruction for first-degree murder. Furthermore, the jury instructions and findings from the penalty phase of his capital trial cannot cure a constitutional defect that occurred during the earlier guilt phase. Appellant's Reply Brief at 9-12. Accordingly, Appellant demands a new trial.

The Commonwealth contends that Appellant is reading the charge out of context. The Commonwealth points out that the trial court first instructed

the jury on the definition of an accomplice, including the requisite intent, and then instructed the jury on the elements of murder of the first degree, specifying that murder of the first degree requires "the specific intent to kill." When read in their entirety, the court's instructions told the jurors that, in order to convict a defendant as an accomplice to murder in the first degree, they had to find that he had the specific intent to promote or to facilitate "the crime" – *i.e.*, murder of the first degree. Commonwealth's Brief at 21-22. The Commonwealth continues that, even if the instructions were flawed, Appellant did not suffer any prejudice, because "the record shows that the jury found that he committed the killing himself. The jury's penalty phase verdict found that [Appellant] was guilty as a principal, not as an accomplice." **Id.** at 25.

The PCRA court's disposition of this issue echoed the argument by the Commonwealth:

> In the case *sub judice*, this court's charge, when read in its entirety, as it should be, appropriately and unambiguously communicated to the jury that [Appellant] must possess the specific intent to kill in order to be found guilty of first-degree murder, regardless of whether he was the principal or an accomplice.

PCRA Ct. Op. at 14 (citing **Commonwealth v. Simpson**, 754 A.2d 1264, 1275 (Pa. 2000), **cert. denied**, 533 U.S. 932 (2001)).

The Supreme Court has instructed:

> [W]hen reviewing the adequacy of a jury instruction, we must consider the charge in its entirety to determine if it is fair and complete. **Commonwealth v. Cooper**, 596 Pa. 119, 941 A.2d 655, 669 (2007); **Commonwealth v. Murphy**, 559 Pa. 71, 739

- 25 -

> A.2d 141, 146 (1999); **Commonwealth v. Stokes**, 532 Pa. 242, 615 A.2d 704, 709 (1992); **Commonwealth v. Prosdocimo**, 525 Pa. 147, 578 A.2d 1273 (1990). The trial court has broad discretion in phrasing the charge and the instruction will not be found in error if, taken as a whole, it adequately and accurately set forth the applicable law. **Prosdocimo**, *supra.* This was the governing precedent prior to **Huffman** and was followed in cases immediately thereafter. **See Commonwealth v. Thompson**, 543 Pa. 634, 674 A.2d 217 (1996); [**Commonwealth v.**] **Chester**[, 587 A.2d 1367 (Pa. 1991)].

**Commonwealth v. Daniels**, 963 A.2d 409, 430 (Pa. 2009). Upon reviewing the charge as a whole and considering the jury's verdict in its entirety, we conclude that no relief is due on this issue.

Preliminarily, we note that **Huffman** and its progeny relate to jury instructions on **accomplice** liability. Here, the jury found that Appellant actually killed Crawford, and thus was a principal, and not an accomplice. **Ramos**, 827 A.2d at 1196 ("The aggravating circumstance the jury found was that Appellant committed the murder during the perpetration of a felony"); **see also** N.T., 1/11/00, at 65-66. Accordingly, **Huffman** is inapplicable to the facts of the current case.

Appellant argues that because the jury's finding that Appellant was the shooter did not become clear until the jury made its aggravated circumstances finding during the penalty phase of his trial, we should not consider this fact in our analysis. Appellant cites no case directly supporting this argument, and we find it unpersuasive. Simply put, Appellant asks us to speculate that the jury may have found Appellant guilty as an accomplice during the guilt phase of his trial but then sentenced him to death as a

principal during the penalty phase. Appellant cites no basis for such a bizarre theory, and nothing in the record supports it. Accordingly, we conclude that even if the jury charge on accomplice liability had been erroneous, that error would not have harmed Appellant because he was convicted as a principal.

We further conclude, however, that the jury charge was not erroneous with respect to accomplice liability. In **Daniels**, 963 A.2d at 431, the Supreme Court approved the following jury instruction as to the requisite individual specific intent to kill to support accomplice liability in a first-degree murder case:

> Under the law of Pennsylvania you may find a Defendant guilty of a crime without finding that he personally engaged in the conduct required for commission of that crime or even that he was personally present when the crime was committed. A Defendant is guilty of a crime if he is an accomplice of another person who commits that crime. . . . He is an accomplice if, with the intent of promoting or facilitating commission of the crime, he solicits, commands, encourages, requests the other person to commit it, or aids, agrees to aid, or attempts to aid the other person in planning of committing it. . . .
>
> If an intention to kill exists, or if a killing was consciously done with knowledge of such consequences, or if the killer consciously decided to kill the victim, the killing is willful. If this intent to kill is accompanied by such circumstances as evidence or demonstrate a mind fully conscious of its own purpose and design to kill, it is deliberate....

The Supreme Court emphasized that, "when reviewing **Huffman**-type challenges, courts must follow the well-settled requirement that the challenged jury charge is to be examined in its entirety." **Id.** at 430. In **Daniels**, "[a]fter reviewing the charge in its entirety," the Court "concluded

that, read as a whole, the charge sufficiently instructed the jury regarding the requirement that an individual must possess the specific intent to kill in order to convicted of first-degree murder." ***Id.***; ***see also id.*** at 432.

Similarly, in ***Commonwealth v. Thompson***, 674 A.2d 217, 218 (Pa. 1996), the Supreme Court approved of the following jury instruction:

> You may find that the Defendant is guilty of a crime without finding that he personally performed the act or engaged in the conduct that is required to commit the crime.
>
> The Defendant is guilty of a crime if he's an accomplice of another person who commits the crime. He's an accomplice if with the intent to promote or facilitate the commission of the crime he either solicits, encourages, commands or requests the other person to commit it or he aids or agrees to aid or attempts to aid the other person in planning or committing it.
>
> You may find the Defendant guilty of the crime on the theory that he was an accomplice as long as you're satisfied beyond a reasonable doubt that the crime was committed and that the Defendant was an accomplice of the person who committed it.

***Id.*** at 222–23 (citation omitted). The Court observed, "This portion of the charge was preceded by the definitions of the different degrees of murder and the definition of specific intent which is required to find a person guilty of first degree murder." ***Id.*** at 223. In upholding the charge, the Court stated:

> The charge in ***Huffman*** incorrectly advised the jury that they could find the defendant guilty of first degree murder if either he or his co-conspirator possessed the necessary specific intent to kill at the time of the murder. In contrast to ***Huffman***, the charge in the instant case correctly stated the law as to the liability of an accomplice in the commission of the crime.

***Id.*** at 222.

The PCRA court concluded that the disputed jury instruction is comparable to the instructions in **Daniels** and **Thompson**, and we agree. As in those cases, the court initially instructed on accomplice liability, stating, in words nearly identical to those in the **Daniels** and **Thompson** charges, that a defendant "is guilty of a crime if he is an accomplice of another person who commits that crime" and is an accomplice "if with the intent of promoting or facilitating the commission of the crime he aids, agrees to aid or attempts to aid the principal in planning or committing the crime." Then, it charged on the requirements for proof of first-degree murder, including that "the killer has specific intent to kill" and acted "with the specific intent to kill and with malice." N.T., 12/30/99, at 16-17, 25-26. Under **Daniels** and **Thompson**, the jury charge was valid.

A case in which the Supreme Court of Pennsylvania found the jury instruction on co-conspirator liability as to first degree murder to be deficient provides us with further guidance. In **Commonwealth v. Wayne**, 720 A.2d 456 (Pa. 1998), **cert. denied**, 528 U.S. 834 (1999), the trial court gave the following instruction on the legal culpability of the appellant as either an accomplice or a co-conspirator:

> Now, with regard to co-conspirator, someone is liable even though he was the conspirator who had the state of mind as necessary. **The person is guilty as a co-conspirator doesn't have to have the same state of mind.**
>
> In other words, two people conspire to kill someone, the person who pulls the trigger may have the intent to kill. **It doesn't matter whether the co-conspirator had it in his mind or not.** He's responsible.

*Id.* at 463 (emphasis added and citation omitted). On appeal, the appellant "assert[ed] that the charge misstated the law by informing the jury that appellant could be guilty of first degree murder even though he did not possess a shared *specific intent to kill* with his co-conspirators," *id.* at 462 (emphasis in original), and the Supreme Court agreed. *Id.* at 464. By comparison, none of the language rejected by the Supreme Court in **Wayne** appears in the challenged jury instruction in the current action. **Compare** *id.* at 463, **with** N.T., 12/30/99, at 16-17, 25-26.

In conclusion, when read in its entirety, the jury charge was not invalid under **Huffman** and its progeny. Thus, the entirety of Appellant's first issue is meritless.

### Issues Relating to Robert Kennedy
### (Appellant's Issues 2 (part), 3, and 4)

Appellant raises several issues relating to the statements made by Robert Kennedy prior to trial and to his counsel's failure to investigate facts relating to Kennedy and to call Kennedy as a witness. During Kennedy's testimony at Appellant's PCRA hearing, Kennedy made four statements about the facts of this case that form the basis of all of these issues:

• First, Kennedy testified that Davis was high on drugs at the time of the murder. N.T., 7/14/08, at 56-59, 138; N.T., 7/15/08, at 15. However, when initially interviewed by police, Kennedy never made any statements about Davis' sobriety or inebriety. **See generally** Investigation

Interview Record of Kennedy, 10/14/98; Investigation Interview Record of Kennedy, 11/12/98.

• Second, Kennedy testified that he had not seen the shooting, N.T., 7/14/08, at 68-69, 76, which is consistent with Kennedy's statements to police. Kennedy had told police that he had "turned towards the bar . . . [t]hen [he] heard a gunshot." Investigation Interview Record of Kennedy, 10/14/98, at 2. Kennedy never said that he had seen anyone pull the trigger or had seen the bullet hit Crawford. **See generally id.**; Investigation Interview Record of Kennedy, 11/12/98.

• Next, Kennedy testified that Crawford was already shot when Kennedy "came outside." N.T., 7/14/08, at 68. His initial statement was that, prior to the shooting, he had "turned towards the bar." Investigation Interview Record of Kennedy, 10/14/98, at 2. Neither the PCRA testimony nor the statement reflect that Kennedy actually observed the shooting.

• Finally, Kennedy testified that he did not identify Appellant as the shooter at any time. N.T., 7/14/08, 84-86. Nonetheless, Kennedy did identify Appellant's photograph from the array shown to him during his second police interview. Investigation Interview Record of Kennedy, 11/12/98, at 2. The Investigation Interview Record, **id.**, has a handwritten note that the photograph identified by Appellant as "the man that shot James Crawford" was "PP # 768938 assigned to Wilfredo Ramos." The Investigation Interview Record has no indication that Kennedy was ever told that the photograph he selected was that of Appellant. **See generally id.**

- 31 -

In sum, between Kennedy's statements to police in 1998 and his testimony during the PCRA hearings in 2008, whether Kennedy identified Appellant as the killer is the only source of direct conflict and potential recantation. As noted above, during Appellant's trial, Detective Reinhold had testified that Kennedy had told him during his police interview "that Wilfredo Ramos was the shooter," without additional explanation. N.T., 12/28/99, at 69. In addition, Kennedy's PCRA testimony made a claim about Davis' lack of sobriety that had not previously been in the record.

*Ineffective Assistance of Counsel Regarding Kennedy*

Appellant maintains that trial counsel was ineffective for failing to interview, to investigate, and to call Kennedy as a trial witness. Appellant's Brief at 2 ¶¶ 2, 4 & at 34-36, 61-64. To obtain relief under the PCRA premised on a claim that counsel was ineffective, a petitioner must demonstrate that (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) petitioner was prejudiced by counsel's act or omission. **See Commonwealth v. Pierce**, 527 A.2d 973, 975 (Pa. 1987). In this context, a finding of "prejudice" requires the petitioner to show "there is a reasonable probability that, but for the error of counsel, the outcome of the proceeding would have been different." **Commonwealth v. Stevens**, 739 A.2d 507, 512 (Pa. 1999). If a petitioner fails to prove any of these prongs, then the claim fails. **Id.** Where "the underlying claim is meritless, the derivative claim of ineffective assistance of counsel for failing to object has no arguable

merit." ***Commonwealth v. Spotz***, 47 A.3d 63, 122 (Pa. 2012); ***Commonwealth v. Lopez***, 739 A.2d 485, 495 (Pa. 1999), ***cert. denied***, 530 U.S. 1206 (2000).

Citing Kennedy's PCRA testimony, Appellant insists that "Kennedy was *compelled* to sign two statements after the police referred to his open bench warrants." Appellant's Brief at 35 (emphasis in original). Appellant also asserts that trial counsel had no reasonable, strategic basis for failing to investigate or to interview Kennedy and that his failure to do so was not the result of a lack of access, because trial counsel had asked the trial court to order Kennedy to be held in Philadelphia County custody, so that he could be brought to the courthouse each day of trial and be reached immediately, if necessary. ***Id.*** at 36-37; ***see also*** N.T., 12/27/99, at 64-66. Appellant broadly contends that trial counsel failed to "investigate the facts and circumstances of [Appellant]'s case" and that this failure "constitutes ineffective assistance of counsel." Appellant's Brief at 46. Appellant further avers that this inactivity by trial counsel is unreasonable *per se*. ***Id.*** at 38; ***see also id.*** at 46 ("Under these circumstances, trial counsel's investigation was unreasonably limited").

Appellant alleges that trial counsel's failure to interview Kennedy caused Appellant prejudice and affected the outcome of his trial, Appellant's Brief at 39-41, as follows: (1) Kennedy's testimony would have undermined Davis's credibility, because Kennedy would have testified that Davis was high on drugs when Crawford was shot, N.T., 7/14/08, at 57-59; and (2)

Kennedy would have challenged Detective Reinhold's statement that Kennedy identified Appellant as the shooter, because Kennedy never saw Crawford's shooter, *id.* at 75-76, 85-86. Appellant also complains that trial counsel did not ask the private investigator he hired to interview or to attempt to interview any other alleged witnesses, and the investigator therefore did not do so. N.T., 9/25/08, at 30, 135-39.[10]

The Commonwealth answers, generally, that Appellant "bases his claim on Kennedy's recantation, years later, that asserted he did not see the murder," Commonwealth's Brief at 27; however, "recantation has often been recognized as one of the least reliable forms of after-discovered evidence." *Commonwealth v. Busanet*, 54 A.3d 35, 47 (Pa. 2012), *cert. denied*, 134 S. Ct. 178 (2013).

The PCRA court determined that trial counsel was not ineffective for failing to conduct an investigation into this issue. PCRA Ct. Op. at 21-29.[11]

_____

[10] Appellant further contends that trial counsel was ineffective in failing to speak with the six police officers whose statements he had received as part of pre-trial discovery. Appellant's Brief at 48 (citing N.T., 9/28/05, at 47). However, Appellant does not clarify how he believes he was prejudiced by trial counsel's failure to interview these police officers. *See generally Pierce*, 527 A.2d at 975.

[11] In reaching this conclusion, the PCRA court cited only to the standard for failure to call a witness. PCRA Ct. Op. at 21-22. Appellant maintains that the PCRA court misunderstood his argument and thought that his only claim was that trial counsel was ineffective for not calling certain witnesses, whereas he was also challenging trial counsel's failure to investigate certain witnesses. Appellant's Brief at 33-34. Since we resolve all of Appellant's claims about Kennedy's potential testimony together and can affirm on any
*(Footnote Continued Next Page)*

The PCRA court agreed with the Commonwealth that Kennedy's testimony at the PCRA hearing on July 14, 2008, was a recantation of "both of his police statements claiming . . . that he . . . was . . . unaware of who, in fact, shot the victim." *Id.* at 23 (citing N.T., 7/14/08, at 38-154). The PCRA court concluded that "Kennedy's PCRA recantation testimony . . . lacks credibility and should be disregarded." *Id.* at 27; *see also id.* at 28.

We must defer to the credibility determinations of the PCRA court. *Raymond Johnson*, 966 A.2d at 539. Since the PCRA court held that Kennedy's PCRA testimony "lacked credibility and should be disregarded" to the extent it was at odds with Kennedy's police statements and with the testimony of all other witnesses, we therefore must discount it. PCRA Ct. Op. at 28. Although Kennedy's PCRA testimony did not recant any earlier statement that he saw Appellant commit the murder (since Kennedy made no such earlier statement), it did depart from what Kennedy had earlier stated about seeing the shooter after the shots were fired and his photo identification. The PCRA court properly exercised its discretion in disregarding this changed testimony.

Because we must defer to the PCRA court's credibility determinations, all issues as to the potential effect of Kennedy's PCRA testimony do not merit relief. Trial counsel cannot be found to have been ineffective for

*(Footnote Continued)* ───────────────
basis, *Commonwealth v. Wiley*, 966 A.2d 1153, 1157 (Pa. Super. 2009), this distinction is inconsequential.

failing to investigate or to call Kennedy as a potential defense witness where, according to the PCRA court's findings, Kennedy would not have given any information inconsistent with that presented to the court. "[C]ounsel cannot be considered ineffective for failing to pursue a meritless claim." *Lopez*, 739 A.2d at 495 (Pa. 1999); *see also Spotz*, 47 A.3d at 122; *Pierce*, 527 A.2d at 975. Accordingly, the PCRA court's denial of these ineffectiveness claims was supported by the evidence of record and free of legal error. *See Wilson*, 824 A.2d at 333.

### Brady *Violation Regarding Kennedy's Statements*

Appellant submits that the PCRA court erred in finding that the Commonwealth did not violate *Brady v. Maryland*, 373 U.S. 83 (1963), through its "failure to disclose and to correct discrepancies between [Kennedy]'s statements and an investigation interview record." Appellant's Brief at 2 ¶ 4. According to Appellant, these "discrepancies" are that "[t]he Investigation Interview Record contains statements allegedly made by Kennedy in which he describes the shooter," but, "during the PCRA hearing, Kennedy testified that he told detectives that he did not see the shooting and could not describe, or identify, the shooter." *Id.* at 56-57. Assuming the truth of Kennedy's PCRA testimony, Appellant further argues that the PCRA court erred in failing to hold that the Commonwealth violated his due process rights by not "correcting" the "false testimony" about Kennedy's initial statements that was presented at trial. *Id.* at 59-60. Appellant also claims that his trial counsel was ineffective for failing to discover and to raise

the alleged *Brady* violation. Appellant's Brief at 2 ¶ 4. The PCRA court rejected these claims. PCRA Ct. Op. at 30.

To establish a *Brady* violation, "[A]ppellant must demonstrate: (1) the prosecution concealed evidence; (2) the evidence was either exculpatory or impeachment evidence favorable to him; and (3) he was prejudiced." *Commonwealth v. Treiber*, 121 A.3d 435, 460–61 (Pa. 2015). As for the second factor, "[e]xculpatory evidence is that which extrinsically tends to establish defendant's innocence of the crimes charged." *Commonwealth v. Lambert*, 765 A.2d 306, 325 n.15 (Pa. Super. 2000); *see also Commonwealth v. Redmond*, 577 A.2d 547, 552 (Pa. Super. 1990) ("[e]xculpatory evidence includes material that goes to the heart of the defendant's guilt or innocence as well as that which might well alter the jury's judgment of the credibility of a crucial prosecution witness" (internal quotation marks omitted) (citing *Giglio v. U.S.,* 405 U.S. 150 (1972))); *Commonwealth v. Watson*, 512 A.2d 1261, 1266 (Pa. Super. 1986) (same as *Lambert*), *appeal denied*, 527 A.2d 540 (1987). "*Brady* does not require the disclosure of information that is not exculpatory but might merely form the groundwork for possible arguments or defenses." *Commonwealth v. Roney*, 79 A.3d 595, 608 (Pa. 2013) (citations and internal quotations omitted), *cert. denied*, 135 S. Ct. 56 (2014).

Critically, Appellant cannot demonstrate that the evidence allegedly withheld by the Commonwealth — specifically, that there were discrepancies between what Kennedy actually told police during his interview after the

shooting and what was recorded in the typed investigation interview record — was exculpatory. The PCRA court found no such discrepancies and rejected Kennedy's assertions at the PCRA hearing that the Commonwealth's summaries of his police interviews were inaccurate. Moreover, even if the alleged discrepancies did exist, they would not establish Appellant's innocence of the crimes charged. Kennedy's contention that he did not see Appellant shoot Crawford does not establish that someone else shot Crawford, and Kennedy does not claim to offer such evidence. Any of the supposedly undisclosed evidence from the investigation interview record therefore would not definitively establish Appellant's innocence or someone else's guilt. **See Redmond**, 577 A.2d at 552.

As Appellant fails to establish one prong of the **Brady** test, we need not exam the remaining two prongs, because his entire **Brady** claim fails if any one prong cannot be supported. **See Treiber**, 121 A.3d at 460–61. Since Appellant's **Brady** challenge is meritless, any claim that his trial counsel was ineffective with respect to seeking this **Brady** material also is without merit. **See Lopez**, 739 A.2d at 495; **see also Spotz**, 47 A.3d at 122.

### Confrontation Clause Claims
### (Appellant's Issue 5)

As we summarized in **Commonwealth v. Yohe**, 79 A.3d 520 (Pa. 2013), **cert. denied**, 134 S. Ct. 2662 (2014):

> The Confrontation Clause of the Sixth Amendment, made applicable to the States *via* the Fourteenth Amendment, **Pointer**

> ***v. Texas***, 380 U.S. 400 . . . (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." . . . Article I, Section 9 of the Pennsylvania Constitution . . . similarly provides: "In all criminal prosecutions the accused has a right . . . to be confronted with the witnesses against him."

79 A.3d at 530-31 & n.10. Insofar as is relevant here, the substantive standards under the Pennsylvania Constitution do not differ from those under its federal counterpart. ***See id.*** at 531 n.10.

Appellant complains that during Detective Reinhold's trial testimony, he referenced a statement made by Michael Centeno:

> Q. Is it fair to say that the information which was furnished by [Appellant] was one of the basic matters which ultimately resulted in your arresting Michael Centeno and charging him with the murder of James Crawford?
>
> A. That and the statement that Michael Centeno made that [Appellant] was the shooter.

N.T., 12/28/99, at 58. Trial counsel did not request that this reference be stricken. ***See id.*** In addition, on re-direct examination, Detective Reinhold read excerpts from the police statements by Kennedy and Nick Cruz in which they described the two men they saw on the night of the shooting. ***Id.*** at 73-76. Trial counsel did not object to that testimony either; in fact, trial counsel specifically stated that he had "no problem with that." ***Id.*** at 73. Thus, trial counsel did not preserve any challenge pursuant to the Confrontation Clause to the references to or the reading of sections of these three statements into the record. Appellant contends that trial counsel

rendered ineffective assistance of counsel for failing to preserve these claims. Appellant's Brief at 73.

Appellant bases his Confrontation Clause claim on ***Crawford v. Washington***, 541 U.S. 36, 68-69 (2004). In ***Yohe***, the Pennsylvania Supreme Court explained the rule of ***Crawford*** as follows:

> In ***Crawford***, 541 U.S. at 51, . . . the Court held that the Sixth Amendment guarantees a defendant's right to confront those "who 'bear testimony'" against him, and defined "testimony" as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." The Confrontation Clause, the High Court explained, prohibits out-of-court testimonial statements by a witness unless the witness is unavailable and the defendant had a prior opportunity for cross-examination.[11] ***Id.*** at 53–56. . . .
>
> [11] The Court described the class of testimonial statements covered by the Confrontation Clause as follows:
>
>> Various formulations of this core class of "testimonial" statements exist: "*ex parte* in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;" "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;" "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."
>
> ***Crawford***, 541 U.S. at 51–52 . . . (internal citations omitted).
>
> To further elucidate the distinction between testimonial and nontestimonial statements, the Court in ***Davis v. Washington***, 547 U.S. 813[, 822] (2006), addressed two types of statements to police and held that whether a statement is testimonial depends on its "primary purpose":

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

79 A.3d at 531 (Pa. 2013) (brackets and some footnotes omitted).

Appellant insists that "the testimony of Detective Reinhold, who read into evidence statements given to the police by Centeno, Kennedy, and Cruz without [Appellant] having had an opportunity to confront them on the witness stand, was blatantly improper" under **Crawford**. Appellant's Brief at 66. In the alternative, Appellant asserts that, "[e]ven if **Crawford** does not apply, admission of [Detective] Reinhold's testimony violated [Appellant]'s Sixth Amendment right to confrontation under **Ohio v. Roberts**, 448 U.S. 56 (1980)." **Id.** Appellant concludes that, due to this violation of his Confrontation Clause rights and to trial counsel's failure to object to this violation, he should be granted a new trial. **Id.** at 76.

On this issue, the PCRA court stated:

Here, [Appellant] did not preserve a Confrontation Clause issue at trial; he is, therefore, not entitled to the retroactive application of **Crawford**. Furthermore, in light of the overwhelming evidence of [Appellant]'s guilt, [Appellant] failed to establish that he was prejudiced by his trial counsel's failure to object to Detective Reinhold's reading into the record statements by Kennedy, Cruz, and Centeno, all of which identified him as the shooter. [Appellant] failed to show that had his counsel objected to this testimony, [Appellant] would have been acquitted. No relief is due.

PCRA Ct. Op. at 20-21. In response, Appellant argues that the PCRA court erred in holding that a preservation failure precludes him from asserting claims under *Crawford* and that he was required to show that, had the Confrontation Clause violation not occurred, he "would have been acquitted." Appellant's Brief at 64 (quoting PCRA Ct. Op. at 20-21). Appellant maintains that he could not have preserved any issue pursuant to *Crawford*, because *Crawford* was not decided until after his trial. *Id.* at 65.[12]

Although it does not argue that *Crawford* does not apply on collateral review, the Commonwealth asserts that Appellant's "Confrontation Clause claim is waived and [that] his derivative ineffectiveness claim is meritless." Commonwealth's Brief at 37. The Commonwealth adds that, "[a]nalyzed under the proper ineffectiveness standard, [Appellant] plainly cannot prove prejudice from the detective's unsolicited remarks on cross-examination." *Id.* at 38.[13] The Commonwealth also declares that Appellant "cannot satisfy the *Crawford* standard" because "*Crawford* prohibits the introduction of formalized, testimonial statements of absent witnesses. The prosecutor elicited no such evidence." *Id.* at 38-39 (citing 541 U.S. at 51-52).

---

[12] *Crawford* was decided on March 8, 2004, while Appellant's petition for certiorari was pending following his direct appeal.

[13] We note that Detective Reinhold read excerpts from Robert Kennedy's and Nick Cruz's police statements on re-direct examination, not on cross-examination. *See* N.T., 12/28/99, at 71, 73-76.

In addressing Appellant's ineffective assistance argument on this issue, we again consider whether the underlying claim has arguable merit, counsel had any reasonable strategic basis for his or her action or inaction, and petitioner was prejudiced by counsel's act or omission. **Pierce**, 527 A.2d at 975. As to the first prong of this test, we assume that Appellant's claim has arguable merit, at least with respect to the use of the statements by Kennedy and Cruz. Although those two statements were not admitted into evidence as exhibits, the prosecutor provided Detective Reinhold with copies of Kennedy's and Cruz's statements and prompted the detective to read specific excerpts from them into the record. Trial Exs. C-8, C-9; N.T., 12/28/99, at 71-76. Furthermore, these quotations were put forth by the Commonwealth, as part of re-direct examination, to establish a consistent description of the murderer by multiple witnesses. **Id.**[14] Kennedy's and Cruz's statements thus were "declaration[s] or affirmation[s] made for the purposes of establishing or proving some fact" — *i.e.*, that the shooter looked like Appellant and did not look like Centeno. **See Crawford**, 541 U.S. at 51; **Yohe**, 79 A.3d at 531. Kennedy and Cruz were not unavailable; they were both in Philadelphia custody and could be transported to the courthouse for Appellant's trial. N.T., 12/27/99, at 64-66. Therefore, under the Confrontation Clause, the Commonwealth could have been required to

_____

[14] Appellant opened that line of questioning by asking on cross-examination whether the statements showed that the shooter wore sunglasses. N.T., 12/28/99, at 58, 65-69.

produce Kennedy and Cruz as witnesses for confrontation by Appellant. *See Crawford*, 541 U.S. at 51-52.[15]

Appellant therefore could have asserted a Confrontation Clause claim regarding these statements if his counsel had objected during trial. *See Commonwealth v. Whitaker*, 878 A.2d 914, 920 n.3 (Pa. Super.), *appeal denied*, 891 A.2d 732 (Pa. 2005).[16] Appellant's counsel made no objection, however. And during the PCRA hearings, trial counsel admitted that he "had no strategic or tactical reason" for not objecting to Detective Reinhold's testimony. N.T., 9/25/08, at 185. Whether Appellant is entitled to relief on

---

[15] We do not assume that Appellant's claim with respect to Centeno's statement also has arguable merit, however. That statement was not read to the jury. *See* N.T., 12/28/99, at 58. Furthermore, the only passing reference to Centeno's statement was elicited during cross-examination and was not put forth by the Commonwealth. *Id.* The one-off comment made by Detective Reinhold about Centeno's remarks was not used prosecutorially. Thus, it did not trigger the Confrontation Clause, and the Commonwealth was not required to produce Centeno as a witness for confrontation by Appellant. *See Crawford*, 541 U.S. at 51-52.

[16] Although the Supreme Court of Pennsylvania has held that "*Crawford* does not apply to collateral review," *Commonwealth v. Carter*, 932 A.2d 1261, 1265 n.3 (Pa. 2007), Appellant's direct appeal was still pending when *Crawford* was decided on March 8, 2004, and his appeal did not conclude until March 22, 2004, when the United States Supreme Court denied Appellant's petition for a writ of certiorari. *Ramos v. Pennsylvania*, 541 U.S. 940 (2004). In *Whitaker*, we held that *Crawford* may apply retroactively to cases that were pending on direct appeal at the time *Crawford* was decided, so long as an objection to the contested evidence was made — even though the objection did not specifically reference *Crawford*. 878 A.2d at 920 n.3; *see also Commonwealth v. Hood*, 872 A.2d 175, 184 (Pa. Super. 2005) (in order to preserve *Crawford* argument, defendant was required to object to admissibility on Sixth Amendment Confrontation Clause grounds), *appeal denied*, 889 A.2d 88 (Pa. 2005).

this issue therefore depends on the third prong of the *Pierce* ineffective assistance test — whether Appellant was prejudiced by his counsel's failure to object to the recitation of Kennedy's and Cruz's statements. *See Pierce*, 527 A.2d at 975.

The PCRA court held that the failure to assert Confrontation Clause rights with respect to the Kennedy and Cruz statements was harmless error. PCRA Ct. Op. at 20-21. We have held that Confrontation Clause errors can be harmless. *See Commonwealth v. Rosser*, 135 A.3d 1077, 1088 (Pa. Super. 2016) (*en banc*), *appeal denied*, ___ A.3d ___, 2017 WL 1194930 (Pa., Mar. 31, 2017). And after a careful review of the trial record, we agree with the PCRA court that the asserted error by trial counsel was harmless here. On this record, we cannot see how the brief reading of these short excerpts during Appellant's three-day trial swayed the jury in any way, given all of the other overwhelming evidence presented by the Commonwealth, as summarized by the Supreme Court on Appellant's direct appeal, *see Ramos*, 827 A.2d at 1198. We see no reasonable likelihood that the outcome of the proceedings would have been different if an objection to these statements had been made.

In challenging this result, Appellant states:

[C]ontrary to the PCRA court's opinion, Reinhold's impermissible identification testimony was highly prejudicial. First, the PCRA court erred in applying the wrong standard. The PCRA court concluded that "Ramos failed to show that . . . [he] would have been acquitted." This conclusion is a clear misinterpretation of the law, which requires [Appellant] to show only that there is a reasonable likelihood the outcome of the proceeding would have

- 45 -

been different. [Appellant] plainly satisfies this standard, because without Reinhold's testimony, the Commonwealth's case would have been based upon a single eyewitness, who was at a known "crack house" when she allegedly witnessed [Appellant] shoot Crawford. Had trial counsel objected, moved to strike, moved *in limine* to exclude, or impeached this testimony, the jury would have been exposed to, or would have been instructed not to consider this damaging testimony.

Appellant's Brief at 75-76 (citations omitted). We disagree. First of all, we do not view the PCRA court's use of the word "acquitted" as controlling. Viewed in context, it is clear that the court was referring to whether an objection to the testimony would have been likely to change the result of the trial. And in any event, we have conducted our appellate review under the proper prejudice standard stated in **Pierce**. Second, we do not view the record that would remain without the contested statements to be as bereft of probative evidence as Appellant suggests. And despite Appellant's effort to denigrate Davis' testimony, she provided direct eyewitness evidence that identified Appellant as the murderer. Striking of the contested statements would not have removed that compelling testimony.

We conclude that the PCRA court did not err in finding that Appellant therefore suffered no prejudice from trial counsel's failure to object and that his claim of ineffective assistance of counsel with respect to the Confrontation Clause issue is without merit. **See Commonwealth v. Simpson**, 66 A.3d 253, 260 (Pa. 2013); **Stevens**, 739 A.2d at 512; **Pierce**, 527 A.2d at 975.

**Challenge to the Photographic Array Shown to Davis
(Appellant's Issue 2 (part))**

In another of Appellant's claims of ineffective assistance of his trial counsel, Appellant contends that trial counsel "failed to examine the photo array from which Davis allegedly identified [Appellant] as the shooter." Appellant's Brief at 49. The background of this issue is as follows: Detective McElvie generated a line-up containing 106 different photographs using an imaging machine. N.T., 12/28/99, at 10-11; **Ramos**, 827 A.2d at 1197. Out of this line-up, eyewitness Jeanine Davis selected two different photographs of Appellant and stated that he was the shooter. Detective McElvie testified during trial that he had been unaware that there was a second, different photograph of Appellant in the array until Davis identified it. N.T., 12/28/99, at 12. Trial counsel never reviewed the full photo array.

Appellant argues that "had trial counsel investigated the photo array, he . . . would have been able to determine the parameters that lead to Davis's signature on two different photographs that both purport to be her identification of [Appellant] as the shooter." Appellant's Brief at 50-51; **see also id.** at 47 ("Trial counsel made no attempt to investigate the credibility of Davis's statements, even though Davis was the Commonwealth's primary witness: she was the only witness who testified at the preliminary hearing, her two police interviews were provided in discovery to trial counsel, and she was the lone alleged eyewitness presented by the Commonwealth at trial" (emphasis and citations to the record omitted)). Appellant continues:

Not only did trial counsel fail to view the actual photo array, but he also admitted that he was unaware of the parameters that had been input into the imaging machine to generate the array. He had the opportunity to request this information, but failed to do so. . . . Although trial counsel failed to examine the photo arrays, or request related information, [Appellant]'s current PCRA counsel has since requested this information from the Commonwealth. The Commonwealth has stated that the file and information concerning the photo arrays and lineup are irretrievable.

*Id.* at 52, 54; *see* N.T., 9/25/08, at 105-06.[17]

The PCRA court construed this issue in the context of an overbroad discovery request. It did not directly address Appellant's ineffective assistance of counsel claim as to trial counsel's failure to examine the photographic array. PCRA Ct. Op. at 51-53.

We conclude that Appellant is not entitled to relief on this issue. At trial, Detective McElvie testified that he entered Davis's description of the murderer into the imaging machine, as well as an age range and a date

---

[17] The Commonwealth contends that Appellant "conceded that he cannot show prejudice from counsel's alleged failure" to "examine the photo array in which Davis identified him as the shooter." Commonwealth's Brief at 32. We disagree. Instead, Appellant has stated:

The Commonwealth has stated that the file and information concerning the photo arrays and lineup are irretrievable. For this reason, current counsel, and this Court, are **unable to determine the full extent** to which [Appellant] has been prejudiced by trial counsel's failures to investigate the photo arrays. However, it is clear that the prejudice caused by these errors is significant and permanent.

Appellant's Brief at 54-55 (emphasis added). Accordingly, Appellant did not concede this point.

range.  N.T., 12/28/99, at 9-11.  Appellant thus was informed of the parameters of the photo array.  Although his appellate brief raises the specter of "innumerable dangers and variable factors" that might make the array unreliable, Appellant's Brief at 51 (quoted citation omitted), Appellant never identifies any specific impropriety about the photo array procedure used here.

Even if trial counsel had found differences between photographs included in the array and Davis's description of the perpetrator, these differences would relate to the credibility of Davis's identification, not to the undue suggestiveness of the array.  ***Commonwealth v. Fulmore***, 25 A.3d 340, 347 (Pa. Super. 2011), ***appeal denied***, 34 A.3d 827 (Pa. 2011); ***see also Commonwealth v. Stiles***, 143 A.3d 968, 979 (Pa. Super.) ("An unduly suggestive photographic array would be one wherein [a]ppellant's photograph stood out as compared to the others"), ***appeal denied***, 163 A.3d 403 (Pa. 2016).  There is no evidence of undue suggestiveness here. Davis identified two different photographs of Appellant from among 106 photographs that were shown to her.  Even Detective McElvie was unaware that there was more than one photograph of Appellant in the array until Davis identified the second image.  N.T., 12/28/99, at 10-11; ***Ramos***, 827 A.2d at 1197.  Her dual identifications bolster the reliability of the process used.

We thus conclude that any challenge to the photographic array shown to Davis is meritless, and "counsel cannot be considered ineffective for failing to pursue a meritless claim." *Lopez*, 739 A.2d at 495.

## Challenges to the Admission of Appellant's Statement
### (Appellant's Issue 6)

Appellant contends that the PCRA court erred in concluding that trial counsel was not ineffective for failing to (1) move to suppress Appellant's statement to police, or (2) object to its introduction at trial. Appellant's Brief at 3 ¶ 6 & 76, 80-82. Appellant continues that the basis for either approach should have been that Appellant was mentally unable to provide a voluntary, knowing statement. Appellant supports this claim with opinions from both his and the Commonwealth's experts that he suffers from a "cognitive disorder not otherwise specified"; "clearly has deficits in IQ testing" — with a full-scale IQ of only 65; and suffers from mild mental retardation or mild intellectual disability. N.T., 5/24/10, at 65-68, 77-84; N.T., 1/4/12, at 16, 111; N.T., 1/5/12, at 17. In addition, Appellant complains that the police who interrogated him used a Spanish interpreter, even though Appellant's primary language is English, not Spanish. N.T., 5/25/10, at 277, 290, 351. Appellant concludes that the PCRA court erred in determining that trial counsel had a reasonable basis for not moving to suppress Appellant's statement, PCRA Ct. Op. at 35, 40-41, and argues that trial counsel's strategy of relying on Appellant's statement as part of his defense was patently unreasonable.

In **Commonwealth v. Harrell**, 65 A.3d 420 (Pa. Super. 2013), **appeal denied**, 101 A.3d 785 (Pa. 2014), we stated:

> A confession obtained during a custodial interrogation is admissible where the accused's right to remain silent and right to counsel have been explained and the accused has knowingly and voluntarily waived those rights. The test for determining the voluntariness of a confession and whether an accused knowingly waived his or her rights looks to the totality of the circumstances surrounding the giving of the confession.
>
> The Commonwealth bears the burden of establishing whether a defendant knowingly and voluntarily waived his [rights under] **Miranda** [**v. Arizona**, 384 U.S. 436 (1966)] . . . .
>
> When deciding a motion to suppress a confession, the touchstone inquiry is whether the confession was voluntary. Voluntariness is determined from the totality of the circumstances surrounding the confession. The question of voluntariness is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess. The Commonwealth has the burden of proving by a preponderance of the evidence that the defendant confessed voluntarily.
>
> When assessing voluntariness pursuant to the totality of the circumstances, a court should look at the following factors: the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion.

65 A.3d at 433–34.

The Supreme Court of Pennsylvania has "consistently refused to adhere to a *per se* rule of incapacity to waive constitutional rights based on mental disease or deficiency." **Commonwealth v. Hughes**, 555 A.2d 1264, 1275 (Pa. 1989). "The fact that a defendant has a low I.Q. does not in and

of itself render his confession involuntary." ***Commonwealth v. Whitney***, 512 A.2d 1152, 1157 (Pa. 1986); ***accord Commonwealth v. Chacko***, 459 A.2d 311, 317 (Pa. 1983); ***Commonwealth v. Glover***, 412 A.2d 855, 859 (Pa. 1980).

We agree with the PCRA court that the record indicates that Appellant was not so mentally incompetent as to render his statement unknowing and involuntary.  PCRA Ct. Op. at 34.  Trial counsel testified that Appellant "always seemed to be able to communicate."  N.T., 9/25/08, at 177.  He added, "In my judgment, and the several times I interviewed him, we were always able to relate pretty well.  And I was not of the impression that the young man had any mental problems, no."  N.T., 4/27/09, at 62.  Detective Reinhold, who took Appellant's statement, testified that Appellant answered his questions coherently and appeared to be of sound mind and not under the influence.  N.T., 12/28/99, at 40.  Additionally, Appellant made no claim and presented no evidence that his interrogation was "manipulative or coercive."  ***Harrell***, 65 A.3d at 434.  Accordingly, the PCRA court found that Appellant had no difficulties communicating and did not present himself as "afflicted with any mental disability."  PCRA Ct. Op. at 36 (citing N.T., 9/25/08, at 177; N.T., 4/27/09, at 62).

We hold that the record supports the PCRA court's "firm[] . . . belief that [Appellant]'s statement[ was] not involuntary" and that his "voluntary, knowing, and intelligent statement afforded no meritorious grounds for filing a motion to suppress."  PCRA Ct. Op. at 40; ***see also id.*** at 34.  We

therefore cannot conclude that Appellant's intellectual disability rendered him incapable of understanding his constitutional rights or rendered his confession involuntary.  *See Hughes*, 555 A.2d at 1275; *Whitney*, 512 A.2d at 1157; *Chacko*, 459 A.2d at 317; *Glover*, 412 A.2d at 859. Appellant's trial counsel cannot be held ineffective for failing to file a meritless motion on that basis or objecting to the statement's introduction at trial.  *Lopez*, 739 A.2d at 495.

As trial counsel explained, he did not object to use of Appellant's statement because it supported his strategy of arguing that Centeno was the killer.  N.T., 4/27/09, at 61.  Counsel was not ineffective for following that strategy.

### Prior Bad Acts
### (Appellant's Issue 7)

Appellant contends that the PCRA court erred in concluding that the introduction of allegedly improper and prejudicial "other crimes" evidence – specifically, drug dealing – by Detective Reinhold and by trial counsel did not violate Appellant's due process rights.  Appellant's Brief at 82.

The PCRA court held that trial counsel was not ineffective for failing to object to this evidence or to request an appropriate limiting instruction about it:

> Here, the Commonwealth introduced [Appellant]'s statement to police which referenced his drug dealing.  In the statement, [Appellant] explained that he was selling drugs from 5:00 pm to midnight on the evening before the shooting and that afterwards he met with Centeno, his uncle, and looked to purchase drugs

for himself. (The decedent's drug-selling corner was open all night.)

Th[e PCRA] court finds that the evidence of [Appellant]'s drug dealing was properly admitted for the legitimate purpose of showing *res gestae*. The evidence was, in fact, an integral part of the case's history as it provided the initial link to the subsequent criminal acts — the robbery and shooting of the decedent.

Furthermore, any potential for unfair prejudice to [Appellant] would have been mitigated by th[e trial c]ourt's limiting instructions:

> Ladies and Gentlemen, you have heard evidence tending to prove that the defendant was dealing drugs between 5:00 p.m. and midnight in the hours before the killing of James Crawford. **The defendant is not on trial on charges relating to drug dealing. You must not regard this evidence as showing that the defendant is a person of bad character or criminal tendencies from which you might be inclined to infer guilt.** If you find that the defendant is guilty of the crimes charged in this case it must be because you are convinced by the evidence that he committed the crimes charged in this case and not because you believe that he is wicked or has committed any other offense.

(N.T.[,] 12/30/1999, [at] 15) (emphasis added).

In light of th[e trial] court's limiting instructions, it would be safe to presume that the jury would have disregarded any allegedly improper testimony by Detective Reinhold. . . . Furthermore, [Appellant] has not sustained his burden of proving that but for his trial counsel's alleged omission, there is a reasonable probability that the jury would have acquitted him. Absent any showing of prejudice, [Appellant] cannot prove that trial counsel was ineffective.

It follows, therefore, that th[e PCRA] court correctly concluded that [Appellant]'s counsel was not ineffective for failure to object to the introduction of "other crimes" evidence, as the evidence of [Appellant]'s drug dealing was properly admitted for the legitimate purpose of showing *res gestae*, the history of the case. Th[e PCRA] court also correctly concluded that

[Appellant]'s counsel was not ineffective for failure to request an "appropriate" limiting instruction for this evidence, as th[e trial] court already provided a limiting instruction which cured any potential for prejudice to [Appellant]. No relief is due.

PCRA Ct. Op. at 44-46.

In ***Commonwealth v. Chmiel***, 889 A.2d 501 (Pa. 2005), ***cert. denied***, 549 U.S. 848 (2006), the Supreme Court stated:

It is a long-standing principle in this Commonwealth that evidence of a distinct crime, except under special circumstances, is inadmissible. ***Commonwealth v. Morris***, 493 Pa. 164, 425 A.2d 715, 720 (1981). Permissible use of evidence of other crimes is addressed in Pa.R.E. 404(b), which states, "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith" but "evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

***Id.*** at 534 (brackets omitted). In ***Commonwealth v. Lark***, 543 A.2d 491, 497 (Pa. 1988), the Supreme Court held that evidence of other crimes may be admissible under the *res gestae* exception, where the evidence became part of the history of the case and formed part of the natural development of the facts. ***See Commonwealth v. Cousar***, 154 A.3d 287, 303–04 (Pa. 2017).

Here, the evidence established that Appellant sold drugs until a few hours before the murder and then went with his uncle to buy more drugs in an area where they are sold twenty-four hours a day. N.T., 12/28/99, at 48. This evidence about the drug transactions established that Appellant was at the crime scene with the co-defendant, how he arrived there, and his reason

for being there.  *See Cousar*, 154 A.3d at 303–04.  Thus, we agree with the PCRA court that this evidence of other crimes met the *res gestae* exception. *See* Pa.R.E. 404(b); *Cousar*, 154 A.3d at 303–04; *Chmiel*, 889 A.2d at 534.  Therefore, trial counsel could not be deemed ineffective by failing to object to it.

Additionally, the trial court instructed the jury that Appellant was "not on trial on charges relating to drug dealing" and that it "must not regard this evidence [of drug dealing] as showing that [Appellant] is a person of bad character or criminal tendencies from which you might be inclined to infer guilt."  N.T., 12/30/99, at 15.  The jury is presumed to have followed the court's instruction.  *See Commonwealth v. Hairston*, 84 A.3d 657, 666 (Pa.), *cert. denied*, 135 S. Ct. 164 (2014).  Because the trial court did give an appropriate limiting instruction, there was no reason for trial counsel to request one.

For these reasons, this claim by Appellant is meritless.  Where "the underlying claim is meritless, the derivative claim of ineffective assistance of counsel for failing to object has no arguable merit." *Spotz*, 47 A.3d at 122.

### Missing *Voir Dire* Transcripts
### (Appellant's Issue 8)

Appellant alleges that two days of the four days of *voir dire* proceedings from the underlying trial were never transcribed and the transcripts were never provided to Appellant or his appellate counsel. Appellant's Brief at 85.  He contends that he "suffered prejudice because,

had appellate counsel sought the missing transcripts during the direct appeal, he would have learned that the transcripts were unavailable, and he could have argued for a new trial on direct appeal." *Id.* Appellant argues that "the PCRA court erred in concluding that the absence of transcripts did not prevent adequate appellate review." *Id.* at 84.

The PCRA court expressed its reasoning on this issue as follows:

[Appellant] does not single out any issues which could not have been adequately reviewed because of the above deficiency of the transcript's *voir dire* portion. [Appellant]'s allegation that the untranscribed portion of the transcript might have allowed his appellate counsel to mount a meritorious challenge is [conclusory] and is not sufficient to raise a violation-of-due-process claim. [Appellant] failed to present any concrete evidence to show that the untranscribed portion of the *voir dire* notes may be of importance for elucidating a cognizable claim. *See* [*Commonwealth v.*] *Marinelli*, 910 A.2d [672,] 688 [(Pa. 2006),] ("[A] conclusory allegation is utterly insufficient to raise a colorable question of whether due process was violated[] by the alleged unavailability of the notes of a particular day's testimony.") (citation and internal quotation marks omitted).

Th[e PCRA] court, therefore, correctly concluded that that the absence of the untranscribed portion of the *voir dire* notes did not result in violation of [Appellant]'s due process rights and that it neither prevented our Supreme Court from fulfilling its statutory obligations nor deprived [Appellant] of adequate appellate review. No relief is due.

PCRA Ct. Op. at 49.

During an appeal from the denial of a PCRA petition in *Commonwealth v. Albrecht*, 720 A.2d 693 (Pa. 1998), the appellant —

argue[d] that he was denied his right to meaningful appellate review due to the selective transcription of the voir dire proceedings and the absence of a transcript of defense testimony during one day of his trial, including that of [several defense character witnesses and] his expert witness . . . He also

argue[d] that his counsel on direct appeal was ineffective in failing to secure a complete record of the proceedings.

*Id.* at 701. The Supreme Court of Pennsylvania rejected the appellant's claim, pointing out that "[t]o be entitled to relief due to the incompleteness of the trial record the defendant must [first] make **some potentially meritorious challenge** which cannot be adequately reviewed due to the deficiency in the transcript." *Id.* (emphasis added). The Court concluded that a bald assertion that there **may** have been improper questions was insufficient to sustain the appellant's argument that his due process rights were violated and "insufficient to raise any inference of prejudice from trial and direct appeal counsel's failure to pursue this issue." Without establishing prejudice, the appellant could not sustain an ineffective assistance of counsel claim. *Id.* at 701-02; **see also Commonwealth v. Schwenk**, 777 A.2d 1149, 1157 (Pa. Super. 2001) (no relief for failing to request that the closing arguments of counsel be transcribed); **Commonwealth v. Richard Johnson**, 459 A.2d 5, 10 (Pa. Super. 1983) (no relief for failing to request transcription of the opening and closing arguments).

We agree with the PCRA court that Appellant did "not single out any issues which could not have been adequately reviewed" due to the untranscribed portions of the *voir dire*. PCRA Ct. Op. at 49. As in **Albrecht**, 720 A.2d at 701, Appellant makes no claim as to what particular errors could have been proven had he had access to these untranscribed notes of

testimony; he presents only the speculative potential of possible error.  His

allegation is insufficient to sustain a claim for relief.  **See Albrecht**, 720

A.2d at 701-02; **Schwenk**, 777 A.2d at 1157; **Richard Johnson**, 459 A.2d

at 10.

## Denial of Appellant's Discovery Requests
### (Appellant's Issue 11)

Appellant filed discovery motions in 2005 and 2007.  Appellant

specifically requested:  (1) the photographic array shown to Davis; (2)

information about the Commonwealth's compensation of or agreement with

Davis; (3) Philadelphia Police Department log entries relating to an individual

named "Will"; (4) the Commonwealth's file for co-defendant Centeno; and

(5) any Commonwealth files relating to any investigation of "Santos Roland,"

who was identified as a possible suspect in an Investigation Interview

Record.  Appellant's Brief at 88-89.[18]  The PCRA court denied his requests.

"We review a PCRA court's denial of an appellant's request for

discovery for abuse of discretion."  **Roney**, 79 A.3d at 603l; **see also

Commonwealth v. Miller**, 987 A.2d 638, 671 (Pa. 2009); **Commonwealth

v. Collins**, 957 A.2d 237, 265 (Pa. 2008).

---

[18] In 2008, Appellant also made an oral motion requesting the results of Centeno's polygraph examinations.  N.T., 9/25/08, at 4-5, 9-11.  However, Appellant makes no argument regarding these polygraph exam results in his brief or his reply brief to this Court, and we therefore deem this issue waived.

Appellant contends that the PCRA court "erred by refusing to provide [Appellant] discovery in aid of his PCRA petition." Appellant's Brief at 88. Appellant argues that, "[i]n each discovery motion, [he] readily demonstrated the existence of good cause and, in addition, established that he was entitled to discovery pursuant to *Brady* and *Giglio v. U.S.*, 405 U.S. 150 (1972), among other authorities." *Id.* at 90. He maintains that "such discovery would confirm that trial counsel was ineffective in failing to undertake a full investigation of the underlying charged crimes." *Id.* at 89; *see also id.* at 46 (trial counsel "failed to conduct any further investigation into the Commonwealth's case to prepare [Appellant]'s defense"). Appellant concludes that "[t]he PCRA court's denial of these discovery motions was improper and warrants reversal on this ground alone." *Id.* at 90. The Commonwealth briefly counters that "the PCRA court did not abuse its discretion by denying discovery." Commonwealth's Brief at 56.

The PCRA court stated that it "correctly denied [Appellant]'s motions for discovery." PCRA Ct. Op. at 50. It explained:

Th[e PCRA] court is firmly of the belief that [Appellant]'s motion [for discovery dated July 27, 2005,] was overbroad and that even if it is deemed not to be, [Appellant] has failed to show good cause as required by Pa.R.Crim.P. []902(E)(2).

Upon consideration, th[e PCRA] court determined that this motion was a "fishing expedition," and that the defense was not entitled to information on every possible lead the police may have followed. [N.T.], 11/7/2005, [at] 29.

With regard to [Appellant]'s August 31, 2007 motion, th[e PCRA] court concluded that, contrary to the defense claims, the discovery sought did not involve any *Brady* material. [N.T.],

10/18/2007, [at] 4[.] . . . Referring to [Appellant]'s discovery request as a "classic fishing expedition," the Commonwealth stressed that it possessed nothing exculpatory and that if it had exculpatory materials it would have turned them over to [Appellant]. [N.T.], 10/18/2007, [at] 16, 18.

Upon consideration of [Appellant]'s discovery requests for the Commonwealth's file on Michael Centeno, the police log entries, and the information regarding Davis' location or relocation, th[e PCRA] court, therefore, properly denied them. . . . Here, [Appellant]'s request for discovery is based on no more than speculation and conjecture. . . . Granting [Appellant]'s request is to enter into the type of "fishing expeditions" not permitted in criminal proceedings. . . . Th[e PCRA] court, therefore, correctly denied [Appellant]'s motions for discovery. No relief is due.

*Id.* at 52, 54, 57.

A petitioner's right to PCRA discovery is governed by Pa.R.Crim.P. 902(E):

(1) Except as provided in paragraph (E)(2), no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of exceptional circumstances.

(2) On the first counseled petition in a death penalty case, no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of good cause.

As Appellant's 2005 and 2007 discovery motions were filed while Appellant was still sentenced to death, prior to his re-sentencing to life without parole in 2008, we will examine them pursuant to the less stringent standard of Pa.R.Crim.P. 902(E)(2).[19]

---

[19] The Commonwealth concedes that Rule 902(E)(2) is applicable because "[t]his was a capital case at the time of [Appellant]'s first discovery motion." Commonwealth's Brief at 57 & n.29. The PCRA court also employed this standard. PCRA Ct. Op. at 52 (citing Pa.R.Crim.P. 902(E)(2)).

The key questions for determining whether good cause exists to compel additional discovery under Rule 902(E)(2) are whether any of the documents would be exculpatory and whether the defendant's reasons for his requests constitute more than mere speculation. *See Commonwealth v. Elliott*, 80 A.3d 415, 449-50 (Pa. 2013) (defendant could not establish good cause necessary to compel additional discovery in death penalty collateral proceedings; he could not identify documents that would be exculpatory, and his claims to the contrary constituted mere speculation), *cert. denied*, 135 S. Ct. 50 (2014). Additionally, a petitioner is not entitled to discovery where he has not shown the existence of the requested documents; speculation that the requested documents exist and will reveal exculpatory evidence does not satisfy the discovery rule. *Commonwealth v. Carson*, 913 A.2d 220, 261 (Pa. 2006), *cert. denied*, 552 U.S. 954 (2007). In light of these standards, we turn to each of Appellant's discovery requests.

<u>*The Photographic Array Shown to Davis*</u>

The first piece of discovery requested by Appellant was the photographic array shown to Davis. Appellant admits that "the Commonwealth has stated that the file and information concerning the photo arrays and lineup are irretrievable." Appellant's Brief at 54. Because this photographic array does not exist, Appellant is not entitled to it. *Carson*, 913 A.2d at 261.

*Alleged Compensation of or Agreement with Davis*

Appellant requested information about any compensation of or Commonwealth agreement with Davis. Our Supreme Court has rejected similar discovery requests because they fail to meet the "showing of good cause" standard under Rule 902(E)(2). Thus, in **Commonwealth v. Bridges**, 886 A.2d 1127, 1131 (Pa. 2005), the Court disallowed a discovery request for information about whether a Commonwealth witness was paid, a request that parallels Appellant's request for information about whether Davis was compensated by the Commonwealth. We therefore conclude that the PCRA court correctly disallowed this discovery.[20]

*Philadelphia Police Department Log Entries*

Appellant's discovery request for Philadelphia Police Department log entries relating to an individual named "Will" is based upon Appellant's contention that, while considering the photographic array, Davis selected someone named "Will." Appellant's Brief at 49; N.T., 10/18/07, at 11; PCRA Ct. Op. at 53. Appellant, whose first name is Wilfredo, argues that he has never used the name "Will" and therefore should be allowed to examine the station's log entries to try to discover whether there was anyone by the name of "Will" who was arrested or investigated. Appellant also links this

---

[20] The PCRA court noted that, in any event, the Commonwealth represented to the court that "nothing" was given to Davis. PCRA Ct. Op. at 53 (quoting N.T., 10/18/07, at 9).

discovery request to his claim that trial counsel failed to investigate the facts of this case, stating —

> Had trial counsel investigated [Appellant]'s family background and personal history, he would have discovered that [Appellant] was never called "Will" by his family, friends, or anyone who knew him and [Appellant]'s mother was willing to testify to this fact during [Appellant]'s trial. Trial counsel's failure to investigate even general background information about [Appellant] led trial counsel to miss a crucial opportunity to impeach Davis on cross-examination.

Appellant's Brief at 49.[21]

In response, the Commonwealth represented that there were no other suspects or any other persons connected to this case named "Will": "There's just Wil-fre-do. There is no other Will." N.T., 10/18/07, at 12.

We agree with the PCRA court that Appellant is only speculating that another individual named "Will" was arrested, investigated, or has had any association with this matter. Indeed, Appellant has stated his argument only in terms of an unsubstantiated "belief."[22] Because Appellant's reasons for

_____

[21] There is no evidence that Davis was family or a friend or acquaintance of Appellant.

[22] *See* Pet'r's Mot. for Discovery Pursuant to *Brady v. Maryland*, 8/31/07, at 10 ¶¶ 45-46 ("[Appellant] **believes** that Ms. Davis misidentified [Appellant], confusing him with 'Will,' . . . Ms. Davis's testimony gives good cause to **believe** that Philadelphia Police Department Incident Logs for the 25th Police District contain entries during the relevant time period relating to an individual known as 'Will.' [Appellant]'s pleading gives good cause to **believe** that such entries refer to someone other than him. Collectively, they establish good cause to **believe** that Philadelphia Police Department Incident Logs for the 25th Police District contain entries during the relevant
*(Footnote Continued Next Page)*

making this request do not constitute more than mere speculation, we agree with the PCRA court that good cause did not exist to compel this additional discovery, and Appellant's request was properly denied. **See** PCRA Ct. Op. at 53; **Carson**, 913 A.2d at 261; **Elliott**, 80 A.3d at 449-50.

### The Commonwealth's Files for Centeno and "Santos Roland"

Appellant requested files relating to his uncle and co-defendant, Centeno, and to a hypothesized suspect named "Santos Roland." He says that he "sought discovery of police files in order to determine the extent to which detectives pursued possible leads and suspects other than [Appellant]." Appellant's Brief at 88-89.[23]

In **Commonwealth v. James Williams**, 86 A.3d 771 (Pa. 2014), the Supreme Court of Pennsylvania rejected a similar request for discovery of the Commonwealth's files and other notes about co-conspirators. The Court explained:

> A defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the Commonwealth's files. . . . Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is

*(Footnote Continued)* _____

time period relating to police knowledge of the existence and activities of an individual . . . known as 'Will'" (emphases added)).

[23] The Commonwealth makes no specific arguments about Appellant's challenge to the denial of these two discovery requests, besides "direct[ing] this Court's attention" to the PCRA court's discussion of these claims. Commonwealth's Brief at 57 n.30. The PCRA court made no findings particular to these requests, beyond its general analysis of why it denied all of Appellant's discovery requests. PCRA Ct. Op. at 50-54, 57.

final.  Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance. . . . A sufficient, specific PCRA factual proffer may be made and credited by the PCRA judge so as to, for example, convince the judge that the Commonwealth has not been candid about the content of its files, so that inspection, whether *in camera* or by the defense, is warranted.  But, the mere fact that a claim sounds in ***Brady*** does not, on its own, create a special right to PCRA discovery.

86 A.3d at 788-89 (citing ***Pennsylvania v. Ritchie***, 480 U.S. 39, 59-60 (1987)); ***see Weatherford v. Bursey***, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case, and ***Brady*** did not create one").

Appellant's basis for requesting the Commonwealth's file on Centeno is mere conjecture.  At the time of his motion, Appellant argued that "the police files **likely** contain information that pertains not only to [Appellant]'s innocence or guilt in the death of Mr. Crawford, but also to mitigating factors warranting the imposition of a non-death penalty sentence."  Pet'r's Mot. for Discovery, 7/27/05, at 7 ¶ 14 (emphasis added).  Appellant continued that he should "be give a full opportunity to conduct a meaningful investigation into all evidence in this case, including any leads, alternative theories, or additional witnesses considered by police.  The police files would **likely** contain any such information and would therefore be invaluable[.]" ***Id.*** at ¶ 16 (emphasis added).  Thus, Appellant merely speculated that this file would likely contain something useful, but he could not articulate what he anticipated would be present in the file.  Appellant's speculation was not a proper basis for obtaining the discovery he sought.

With respect to Appellant's other request, there is no evidence that "Santos Roland" even exists — let alone that there was ever an investigation into this alleged suspect. Without explaining with greater specificity what he hopes to find, Appellant cannot be granted "unsupervised authority to search through the Commonwealth's files." *James Williams*, 86 A.3d at 788. As in *James Williams*, Appellant's supposition is not evidence, and mere speculation cannot constitute good cause to compel discovery. *See Elliott*, 80 A.3d at 449-50.

For these reasons, we concur with the PCRA court that none of Appellant's PCRA discovery requests constitute good cause, and, accordingly, we find that the PCRA court did not abuse its discretion in denying Appellant's discovery requests. *See Elliott*, 80 A.3d at 449-50; *Roney*, 79 A.3d at 603.

**Ineffectiveness of Appellate Counsel**
**(Appellant's Issue 9)**

In his ninth issue, Appellant claims that "the PCRA court erred in concluding that appellate counsel's deficient representation did not deny [Appellant] a right to a direct appeal." Appellant's Brief at 86. Appellant argues:

> Despite the many meritorious constitutional claims [allegedly raised by Appellant in this PCRA appeal], appellate counsel failed to identify even one record-based claim on [direct] appeal, and had no strategic reason for this failure. [N.T., 07/15/08, at 175.] . . . Prejudice is presumed "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing . . . mak[ing] the adversary process itself presumptively unreliable." [*United States v.*] *Cronic*, 466 U.S. 648, 659

(1984). . . . Appellate counsel's deficient performance effectively denied [Appellant] assistance of counsel in his direct appeal, making the adversary process presumptively inadequate. . . . It was error for the PCRA court to find that appellate counsel was effective.

*Id.* The Commonwealth replies:

[Appellant] may not have a presumption of appellate counsel's ineffectiveness. . . . [Appellant]'s vague allusions to appellate counsel's alleged failure to identify "the many meritorious constitutional claims . . ." (Brief for Appellant at 86), falls well short of proof that appellate counsel failed to subject the Commonwealth's case to meaningful adversarial testing, the rarely applied **Cronic** exception he seeks to invoke. . . . No relief is due.

Commonwealth's Brief at 53-55.

In rejecting this issue, the PCRA court stated:

Appellate counsel was not ineffective for not raising any of the alleged violations on appeal. . . . It is the province of appellate counsel to make strategic decisions as to what issues to raise on appeal "in order to maximize the likelihood of success." **Smith v. Robbins**, 528 U.S. 259, 288 [(2000)]. . . . Here, by not raising [Appellant]'s claims on direct appeal, appellate counsel demonstrated that he recognized the claims as meritless. . . .

PCRA Ct. Op. at 46-47. After carefully reviewing the record, we agree. Because, as demonstrated above, Appellant would not have been afforded the relief sought on these claims, appellate counsel had no reasonable basis to bring them. **See Commonwealth v. Davidson**, 860 A.2d 575, 579 n.1 (Pa. Super. 2004) ("the effectiveness of appellate advocacy may suffer when counsel raises numerous issues, to the point where a presumption arises that there is no merit to any of them" (citations omitted)), **aff'd**, 938 A.2d 198 (Pa. 2007); **Pierce**, 527 A.2d at 975. Additionally, Appellant cannot

succeed in demonstrating that, but for appellate counsel's alleged omissions, the outcome of his direct appeal would have been different. *Id.*

Appellant attempts to analogize his case to *Cronic*, 466 U.S. 648. Appellant's Brief at 86. However, the United States Supreme Court clarified in *Florida v. Nixon*, 543 U.S. 175, 189-90 (2004), that the circumstances giving rise to the *Cronic* presumption are infrequent and are limited to situations where counsel's failure is complete – that is, where "counsel has entirely failed to function as the client's advocate." Here, appellate counsel did raise issues on appeal. *See Ramos*, 827 A.2d at 1196, 1198 (listing appellate issues). Nothing about appellate counsel's actions in the current matter represent the "complete failure" of counsel that would trigger the *Cronic* presumption. *See Commonwealth v. Mallory*, 941 A.2d 686, 702 (Pa.), *cert. denied*, 555 U.S. 884 (2008).

Thus, we concur with the PCRA court that appellate counsel did not provide ineffective assistance. Appellant's penultimate claim is meritless.

### Cumulative Errors
### (Appellant's Issue 10)

Finally,[24] Appellant claims that the PCRA court "erred in failing to consider the prejudicial effects of cumulative errors, entitling [Appellant] to

---

[24] Appellant's briefs consume more than 100 pages, and we have carefully reviewed all of the arguments made by Appellant in those briefs. This memorandum addresses the main arguments presented by Appellant. Any argument that is not addressed here has been considered and found without merit.

relief." Appellant's Brief at 88. In response, the Commonwealth states that "[Appellant] may not have relief on the cumulative effect of non-existent errors" and that "[Appellant] has not demonstrated, as he must, that although he has not proved prejudice from any individual error, a different cumulation analysis entitles him to relief." Commonwealth's Brief at 55-56 (citing **Commonwealth v. Hutchinson**, 25 A.3d 277, 318-19 (Pa. 2011), **cert. denied**, 132 S. Ct. 2711 (2012)). The PCRA court agreed with the Commonwealth, stating:

> Under Pennsylvania law, "no number of failed claims may collectively attain merit if they could not do so individually." **Commonwealth v. [Craig] Williams**, 532 Pa. 265, 278, 615 A.2d 716, 722 (1992). **See also Commonwealth v. Ellis**, 700 A.2d 948, 962 (Pa. Super. Ct. 1997) ("Ellis contends that the individual claims may not require a new trial, but the cumulative impact of them may have led to an improper verdict. This argument is clearly meritless.").
>
> Here, individually and together, [Appellant]'s claims lack merit. Th[e PCRA] court agrees with the Commonwealth's conclusion that since none of [Appellant]'s claims merits relief individually, there simply is no "cumulative effect" to consider. Commonwealth's Post-Hearing Brief, 06/30/2014, [at] 41.
>
> [Appellant]'s assertion that he was entitled to relief from his conviction due to the prejudicial effects of the cumulative errors in his case is meritless.

PCRA Ct. Op. at 46-47, 50.

> We agree:
>
> [The Supreme Court of Pennsylvania has] often held that no number of failed claims may collectively warrant relief if they fail to do so individually. However, we have clarified that this principle applies to claims that fail because of lack of merit or arguable merit. When the failure of individual claims is

grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed.

However, while cumulative prejudice may properly be assessed with respect to individual claims that have failed due to lack of prejudice, nothing in our precedent relieves an appellant who claims cumulative prejudice from setting forth a specific, reasoned, and legally and factually supported argument for the claim. A bald averment of cumulative prejudice does not constitute a claim. Appellant has set forth no reviewable claim, and he is entitled to no relief.

***Spotz***, 47 A.3d at 129 (internal brackets, citations, and quotation marks omitted); ***see also Commonwealth v. Bryant***, 855 A.2d 726, 751 (Pa. 2004) ("No number of failed claims may collectively attain merit if they could not do so individually" (brackets and citation omitted)).

We have held in this memorandum that Appellant has not raised any claims that entitle him to relief. We found no errors with respect to Appellant's challenge under ***Huffman***, challenges to trial counsel's investigation and selection of witnesses, the failure to assert purported ***Brady*** errors, the challenge to the admission of Appellant's statement and to *res gestae* evidence, the challenges to the lack of transcripts and discovery, and the attack on Appellant's appellate representation. Because none of these claims have merit, counsel could not have been ineffective in asserting them. ***See Spotz***, 47 A.3d at 122; ***Lopez***, 739 A.2d at 495. Because each of these claims was meritless individually, they cannot attain merit collectively. ***See Spotz***, 47 A.3d at 129.

Appellant's only "individual claims that have failed due to lack of prejudice," ***see Spotz***, 47 A.3d at 129, were his challenges to Detective

Reinhold's reading of Kennedy's and Cruz's statements during the detective's testimony. However, Appellant makes no particularized, specific, or reasoned argument for prejudice related to cumulative error for these or any other claims. *See id.* He does not even identify these or any other particular issues as the bases for his cumulative error challenge or articulate how these two challenges in combination were so prejudicial as to entitle him to relief, even though the challenges did not give rise to a right to relief individually. *See* Appellant's Brief at 87-88.

Appellant's entire argument consists of five sentences and a citation to several federal decisions, without detailing how those cited cases apply. *See* Appellant's Brief at 87-88. Such a vague, generalized, undeveloped claim is not reviewable. *See Chmiel*, 30 A.3d at 1189 (when appellant's "entire argument consists of three sentences, with citation to two United States Supreme Court cases, generally asserting a right to relief grounded in an alleged denial of his rights under the 5th, 6th, 8th, and 14th Amendments," cumulative error claim "is not reviewable" (citing *Commonwealth v. Small*, 980 A.2d 549, 579 (Pa. 2009) (rejecting broad and vague claim of the prejudicial effect of cumulative errors)). It certainly is not so persuasive as to entitle Appellant to relief. After engaging in our own review of these claims, we, like the Supreme Court of Pennsylvania in *Chmiel*, 30 A.3d at 1190, "discern the absence of any furrow deep enough to allow a 'cumulating' impact of prejudice to flow in establishing a right to a

new trial or penalty hearing."  Accordingly, Appellant's final issue is without merit.

## CONCLUSION

Having discerned no abuse of discretion or error of law, we affirm the order denying Appellant's PCRA petition.  **See Wilson**, 824 A.2d at 333.

Order affirmed.

Judge Shogan joins the memorandum.

Judge Platt concurs in the result.

*Judgment Entered.*

*JosephD.Seletyn,Esq.*

*Prothonotary*

*Date: 9/27/2017*